Joseph TOUSSAINT, et al., Plaintiffs,

v.

Daniel J. McCARTHY, et al.,
Defendants.

No. C–73–1422 SAW.

United States District Court,
N.D. California.

Oct. 18, 1984.

Sidney M. Wolinsky, Anita Arriola, Public Advocates, Inc., Morris J. Baller, Mexican-American Legal Defense and Education Fund, James C. Sturdevant, Law Offices of James C. Sturdevant, Bernard Zimmerman, Sarah Flanagan, Mark A. Chavez, Sanford Jay Rosen, Ellen Sue Goldblatt, Barbara Y. Phillips, Law Offices of Sanford Jay Rosen, San Francisco, Cal., Donald H. Specter, Michael Satris, Prison Law Office, San Quentin, Cal., Jack Greenberg, Deborah Fins, New York City, for plaintiffs.

John K. Van de Kamp, Atty. Gen., of the State of Cal., Karl S. Mayer, Thomas P. Dove, Deputy Attys. Gen., San Francisco, Cal., for defendants.

WEIGEL, Senior District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

The following Findings of Fact and Conclusions of Law underlie the Court's decision on the merits of a class action challenging the legality of conditions of confinement for prisoners held in administrative segregation—hereafter referred to as "segregation"—in the California State Prison at San Quentin ("San Quentin") and the California State Prison at Folsom ("Folsom").[1] The lengthy history of the litigation was recounted in some detail in connection with the preliminary injunction entered in this case on January 14, 1983, *see Toussaint v. Rushen*, 553 F.Supp. 1365,

---

1. Plaintiffs are a class, certified February 25, 1976, comprising all prisoners confined in or subject to confinement in administrative segregation in four California state prisons—in addition to San Quentin and Folsom, Deuel Vocational Institute at Tracy ("DVI-Tracy"), and the Correctional Training Facility at Soledad ("Soledad"). *See Toussaint v. Rushen*, 553 F.Supp. 1365, 1367 & n. 1 (N.D.Cal.1983) (defining term "administrative segregation"). Defendants are the Director of the California Department of Corrections and the wardens and superintend-

ents of the above-listed institutions. This decision applies only to conditions at San Quentin and Folsom, which were the subject of a trial before the Court beginning November 7, 1983, and ending January 11, 1984. The second phase of trial, pertaining to conditions at DVI-Tracy and Soledad, is presently scheduled to commence in November, 1984. Segregated units at these two prisons will continue to be subject to the preliminary injunction entered January 14, 1983.

1367–69 (N.D.Cal.1983), *vacated in part,* 722 F.2d 1490 (9th Cir.1984), and need not be repeated here. The preliminary injunction was affirmed by the Ninth Circuit on January 5, 1984, except for one portion dealing with food service, which was vacated because unsupported by specific findings. *Toussaint v. Yockey,* 722 F.2d 1490 (9th Cir.1984).

The first phase of trial on the merits commenced in this Court on November 7, 1983. It was limited to conditions at the San Quentin and Folsom prisons largely because of representations made by defendants that segregation at Soledad and Tracy would soon be discontinued. Trial lasted nearly two months. More than 65 witnesses testified. There are well over 1000 trial exhibits. The transcript is 4643 pages long. In addition, the Court, accompanied by counsel for both sides, inspected the premises at San Quentin.

The findings and conclusions which follow are based upon the Court's independent review of all the evidence as well as upon consideration of the findings and conclusions proposed by both sides. As detailed below, the Court finds and concludes that conditions of confinement for segregated inmates at San Quentin and Folsom violate the Eighth and Fourteenth Amendments to the United States Constitution and that relief previously ordered in this case to correct constitutional violations has not been fully effective.[2] The Court accordingly renders a Judgment of Permanent Injunction ordering termination of the unlawful conduct of defendants and providing for the appointment of a Special Master to monitor compliance.

■ The Eighth Amendment to the Constitution prohibits the infliction of "cruel and unusual punishments." The ultimate question in this case is whether the defendants, officials of the State of California, have violated this prohibition by confining prisoners under the conditions that obtain in segregation units at San Quentin and Folsom. To answer this question is difficult, because no static "test" can be formulated to determine whether conditions of confinement are "cruel and unusual." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Rather, the meaning of the Eighth Amendment prohibition is to be drawn "from the evolving standards of decency that mark the progress of a maturing society." *Id.; Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). Ordinarily, the Court's judgment as to the nature of these standards should be governed to the maximum possible extent by objective indicia of what the general public would consider decent.[3] *See Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399; *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.1982). But public perceptions are not alone conclusive. In the cogent words of Chief Justice Warren, "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop,* 356 U.S. at 100, 78 S.Ct. at 597; *see Gregg v. Georgia,* 428 U.S. 153, 178, 96 S.Ct. 2909, 2927, 49 L.Ed.2d 859 (1976) (plurality opinion).

■ In the context of cases challenging prison conditions, courts in this circuit and others have commented that "[a]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care and personal safety." *Hoptowit,* 682 F.2d at 1246; *Wright v. Rushen,* 642 F.2d 1129, 1132–33 (9th Cir.1981); *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Newman v. State of Alabama,* 559 F.2d 283, 286 (5th

---

**2.** *See Wright v. Enomoto,* 462 F.Supp. 397, 399, 404 (N.D.Cal.1976), *aff'd,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978); *Toussaint v. Rushen,* 553 F.Supp. 1365 (N.D.Cal.1983).

**3.** Such indicia include, for example, history, the provisions of law enacted by state legislature, expert opinions and professional standards. *See, e.g., Rhodes,* 452 U.S. at 346–47, 101 S.Ct. at 2399–2400; *Estelle v. Gamble,* 429 U.S. 97, 103–04 & n. 8, 97 S.Ct. 285, 290–91, & n. 8, 50 L.Ed.2d 251 (1976); *Toussaint v. Yockey,* 722 F.2d at 1495.

Cir.1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Of course, this enumeration is not necessarily exhaustive. For example, it is settled that prisoners may not be deprived of all exercise, because "some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir.1979) (citing cases); *Ruiz v. Estelle*, 679 F.2d 1115, 1152 & n. 173 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Martino v. Carey*, 563 F.Supp. 984, 1001 (D.Ore. 1983).

The task before the Court is to examine each specific challenged condition of confinement and to determine whether that condition, in the context of the overall prison environment, comports with human decency. *Wright v. Rushen*, 642 F.2d at 1133. If found indecent, the condition must be remedied. However, the relief granted must be only so much as is required to correct the specific deficiency. *Hoptowit*, 682 F.2d at 1247; *Wright*, 642 F.2d at 1134.

## II. FINDINGS OF FACT

1. San Quentin and Folsom are among the oldest penal institutions still in use in the United States today. San Quentin first opened in 1853; Folsom in 1880. The buildings presently used to house the majority of segregated inmates are relatively old and outmoded five-tier cell blocks constructed between 1910 and 1934.[4] Segregated inmates are also housed in two more modern buildings, SHU I at Folsom and the "Adjustment Center" at San Quentin. The latter was built in 1959 and 1960.

2. The class of plaintiffs in this action is defined principally by reference to the percentage of each day that they are required to spend in their cells.[5] The term "segregated inmate" means, at bottom, one who is not permitted to mingle with the general prison population. To accomplish segregation, prison officials at San Quentin and Folsom lock inmates in their cells on a round-the-clock basis. Under this system, segregated inmates are allowed out of their cells only for essential activities such as showers, exercise, visits, medical treatment and classification hearings. During all such excursions, segregated inmates are made to wear handcuff restraints except when they are actually showering, exercising or contact visiting. In the record and in these findings, this form of confinement is referred to interchangeably as "segregation" or "lockup."

3. According to a former warden, approximately 2100 inmates are typically held in segregated confinement at San Quentin at any one time. Upwards of 500 are so held at Folsom. Credible testimony presented at trial disclosed that the concentrated confinement of such large numbers of segregated inmates is extremely rare, if not unprecedented, in the history of American corrections.

4. The reasons why inmates are assigned segregated status at San Quentin and Folsom vary. Formally, they may be placed in three categories. First, inmates are segregated as punishment for disciplinary rule infractions. This sort of lockup is commonly referred to as "segregated housing" or "SHU". Second, inmates are segregated because of an institutional perception that they pose a threat to the safety of other inmates or staff, or to the security of the institution. This type of

---

4. As of April 6, 1982, at least 1000 segregated inmates were housed in five-tier cell blocks at San Quentin. *See* Exhibit 56. About 64 were housed in another unit, the Adjustment Center. Likewise, at Folsom the great majority of segregated inmates are housed in the five-tier SHU II.

5. The official definition of plaintiffs' class is set forth in the Order Determining that Action is Maintainable as a Class Action, entered February 25, 1976. Plaintiffs include all inmates housed in "any of the maximum security, minimum privilege, segregated housing units in San Quentin Prison, Folsom Prison, the Correctional Training Facility ('Soledad'), and the Deuel Vocational Institute ('DVI')." The most significant aspect of this definition is the term "segregated housing." The meaning of this concept is discussed in text below.

lockup is sometimes called "management control." Third, inmates are segregated because of a perception that the inmates themselves may be harmed by other inmates if they must mingle in the general population. This variety of lockup is sometimes called "protective housing."

5. In addition, there is a fourth term used to describe a form of segregated status: "Administrative segregation." Although sometimes used as a catch-all to refer to lockup generally, "administrative segregation" technically refers only to a temporary status to which an inmate is assigned for a period of up to 30 days pending a determination of whether he should be assigned more permanent "segregated" status for one of the three reasons listed above. Evidence at trial showed that many or most prisoners newly arriving at San Quentin or Folsom are initially placed in "administrative segregation" for a period of "orientation."

6. Present policies of the California Department of Corrections call for the housing at San Quentin and Folsom of "Level IV" inmates. These are inmates classified as requiring the highest level of security in custody, based on their precommitment history, commitment offense, term of imprisonment, and other case factors.[6] Most have had, in essence, a life of crime, sometimes going back to age six or seven. San Quentin is particularly notorious for its "irrascible population" and "aura of brutality." In a report prepared by the Board of Governors of the State Bar of California, received in evidence, San Quentin was characterized as California's "Devil's Island." The inmate population at Folsom is not materially different. As many of the plaintiffs in this case are among the most antisocial and violent of the inmates held in the two prisons, they pose formidable behavior problems for correctional staff.

Following are the Court's findings concerning each condition of confinement challenged by plaintiffs.

**6.** *See generally* 15 Cal.Admin.Code § 3375(b)

## A. Segregation Cells

7. The cells in which plaintiffs are presently housed at San Quentin are located in four buildings: The Adjustment Center (SHU), South Block (SHU "B" or "Badger," "C" or "Carson," and "D" or "Donner" Sections), East Block (MCU) and North Block (MCU). At Folsom, plaintiffs are housed in two buildings, referred to herein as "SHU I" (Building 4) and "SHU II" (Building 1, Sections B and C).

8. South Block, East Block, and North Block at San Quentin, and SHU II at Folsom, are five-tier cell blocks. That is, they contain five rows, or "tiers," of cells stacked vertically atop one another. Outside the barred fronts of the cells runs a walkway, also enclosed by bars, and outside the walkway, approximately 20 to 30 feet of open space extends unbroken from the bottom of the first tier to above the top of the fifth tier. On the wall behind the open space, opposite the cell fronts, other walking platforms called "gunwalks" are mounted. This wall also contains windows. For most of the cells in these cell blocks, the windows across the open space and behind the gunwalks are the sole source of natural light.

9. The Adjustment Center at San Quentin and SHU I at Folsom are more modern in design. The cells are arranged in separate floors, with their fronts facing on enclosed corridors.

10. The cells used to house segregated inmates in all of these units are basically similar. All are between five and six feet in width, and between eight and ten feet in length. The smallest is 45.5 square feet (Folsom SHU I), while the largest is 56 square feet (San Quentin Adjustment Center). Most lockup prisoners are housed in cells measuring 48 (San Quentin five-tier cell blocks) or 49.5 (Folsom SHU II) square feet. These cells are generally furnished with one or two bunk beds, a coverless toilet, a sink, a shelf, and a small mirror. The fronts of the cells are open, except for bars. The remaining walls, ceiling and floor are solid and windowless. The cells

(1981).

also have a light, sometimes mounted on the ceiling and sometimes on the back wall. Most, if not all, contain one double electrical outlet.

11. A small number of these cells have, in addition, a solid outside door with only a small window or no window. Since the door admits virtually no natural light, and the electric light is controlled from the outside, these cells can be made completely dark indefinitely at the discretion of correctional authorities. So used, they are called "quiet cells." Although the use of quiet cells is not officially permitted, evidence at trial established that prisoners are in fact confined in such cells during the day-time with the solid door closed and the light turned off from the outside.

12. Plaintiffs are restricted to their cells at all times, except when there is some specific reason for permitting them to be elsewhere. Plaintiffs are thus required to perform all functions of eating, sleeping, and elimination within the cells. Not uncommonly, a segregated inmate may languish five or more consecutive days locked inside his cell, never once setting foot outside the cell.

### B. Double-Celling

13. Until recently, some lockup inmates at both San Quentin and Folsom were involuntarily double-celled.[7] Because only about eighteen inches separate the bunks from the opposite wall, one of the two inmates must remain on his bunk at all times if the other is to move freely about the cell. The distance between the surface of the top bunk and the ceiling is insufficient to permit a man to sit upright on that bunk. Confining two inmates together in a cell of the dimensions here involved, under the conditions prevailing in lockup at San Quentin and Folsom, deprives each of any semblance of privacy, since neither is permitted to leave the cell. Such confinement, in the midst of the other abhorrent conditions detailed below, engenders tension and psychiatric problems. Still worse, it inevitably engenders violence, particularly violence between cellmates. The stronger of the inmates generally establishes psychological, physical, and often sexual dominance over the other.

14. The overwhelming majority of witnesses for both sides at trial sharply criticized the practice of double-celling under conditions prevailing in lockup at San Quentin and Folsom. Two witnesses who have been defendants in this case (former California Director of Corrections Ruth Rushen and former San Quentin Warden George Sumner) stated that such double-celling is "inhuman." The Court so finds.

### C. Heating and Ventilation

15. In the San Quentin Adjustment Center and Folsom SHU I, the heat in cells used to house segregated inmates is adequate. In the remaining buildings, used to house most plaintiffs, it is not. At San Quentin, each five-tier cell block is supposed to be heated by an internal gas heater and ventilating system. Frequently these systems do not work, even in the winter. The chill resulting from lack of heat is compounded by numerous broken windows, which admit cold air and moisture.[8] Moisture also enters the units through leaky roofs and overflowing sinks, toilets, and showers. The result has been aptly described as a "chilly mist" that dampens everything in the cell blocks, particularly at

---

7. As a result of the preliminary injunction entered by this Court on January 14, 1983, there is now no double-celling in segregated units of either prison. However, the record contains ample evidence, including the testimony of inmates formerly double-celled in lockup, to enable the Court to make findings concerning the character and effects of the practice.

8. In response to this Court's preliminary injunction, some efforts have been undertaken to prevent and repair broken windows at both pris-ons. Again, the record contains ample evidence to support a finding that in the absence of court order, large numbers of broken windows have been left unrepaired by prison officials for lengthy periods. Moreover, some windows have not been repaired promptly even since entry of the injunction.

Many of the broken windows are caused by inmate misbehavior. Some are caused by gunfire in the units.

night. Conditions in SHU II at Folsom are similar. Consequently segregated inmates at both prisons complain of "freezing." To combat the chill, many wear all their clothing at all times, even while sleeping. Many also huddle under blankets for warmth, even during the day. One inmate testified that to combat what he called the "miserable cold" inside Folsom SHU II during the winter of 1982–83, he usually lay fully dressed beneath two blankets with a layer of newspaper in between. Lockup inmates also frequently cover their cell bars with cardboard or paper in an effort to keep out the cold breezes that sweep through the units. Recognizing the existence of drafts, prison guards commonly permit this practice, although it is officially prohibited for reasons of security and fire safety.

16. Most lockup buildings lack functional ventilation systems. An expert who conducted tests in all lockup units found no measurable air movement in any except the East Block MCU at San Quentin.[9] A putrid odor lingers about the units. This odor is caused by the bodily functions of inmates, eating, sleeping and eliminating under crowded conditions in the same immediate area. In addition to giving rise to a foul living environment, the lack of adequate ventilation fosters the spread of communicable disease among the inmates, and particularly among double-celled inmates. During the summer, some of the cell blocks become exceedingly warm, particularly the upper tiers.

### D. Plumbing

17. Evidence at trial established that the plumbing and sewage disposal systems in lockup units at both prisons are antiquated, deteriorated, and in need of replacement. These systems have simply broken down from years of very heavy use without

adequate preventive maintenance. Sewage pipes at San Quentin are rotten and frequently clog, causing raw sewage to back up into the lockup units. This, of course, intensifies the foul odor and disease hazards in the units. So too does the fact that sewer caps are missing, allowing methane, a nauseating and potentially explosive gas, to escape into prison buildings. The sewer system at Folsom also suffers from "major" problems, according to the Chief of Plant Operations at the prison. The plumbing system at both prisons exhibits symptoms of serious age deterioration, including corrosion and leakage.[10]

18. In-cell plumbing is hardly better. Leaks are prevalent in both cell toilets and sinks. The leaking water flows onto the floors of the tiny cell cubicles, further exacerbating the damp, cold conditions that frequently obtain. Often these leaks are not repaired for long periods. Toilet and sink drains malfunction and clog on frequent occasions.[11] Sometimes, but not always, these problems are caused by the misbehavior of inmates who occupy the cells and who flush improper items.

19. Behind the back walls of the cells in each unit, to which the sinks and toilets are connected, runs a service area or "pipe chase." The condition of these areas, as demonstrated by uncontradicted evidence, is shocking. Plumbing pipes leak in various places, as do broken sewage mains and steam water lines. An environmental expert identified in the bottom of more than one pipe chase waste material from a sewer cleanout, including human feces, and rotting garbage. The filth in these service areas adds to the general stench in the immediately adjacent cell area. It provides an ideal medium in which the cockroaches and rats that infest both prisons spawn and thrive. These appalling conditions, in close

---

9. Defendants did not introduce any test results to contradict or dispute this data.

10. Cross-connections between the fresh water and waste water systems are not fitted with vacuum breakers, creating a risk that waste water could contaminate the fresh water supply.

11. In addition to problems of malfunction, the evidence shows that the plumbing fixtures can also cause problems by breaking. One inmate testified that he suffered extensive cuts requiring hospitalization when his toilet broke while he was sitting on it. When assigned to another cell following his return from the hospital, he immediately tested the toilet. It also broke.

proximity to the living area, pose a substantial hazard to the health of segregated inmates.

20. Another serious health hazard recurrent in the five-tier units is standing water. Stagnant pools are common in the showers, where drains are often clogged. Puddles also accumulate from time to time in the bottoms of the cellblocks, which are not always equipped for adequate drainage. Cells occasionally flood as a result. These pools foster vermin, including mosquitoes, and mildew.[12]

### E. Lighting

21. As described above, cells in the five-tier units admit little natural light. The only source of such light is the wall across from the fronts of the cells. The cells are but dimly lit inside. Generally they are equipped with one bare light bulb.[13] This produces a maximum cell illumination of between 7 and 15 foot-candles. Illumination of 20 foot-candles is deemed an "essential" standard for the housing of inmates by the American Correctional Association (ACA). The Society of Illuminating Engineers considers 30 foot-candles the minimum required for reading and writing without headaches or eyestrain. The uncontradicted evidence establishes that the great majority of inmates in all lockup units at both prisons lack sufficient light in their cells to read comfortably while seated or lying on their bunks.[14]

### F. Noise

22. The unrelenting, nerve-racking din that fills the segregation units was roundly condemned by every witness who addressed the subject. The constant racket, while a problem in all units, is worst in the five-tier cell blocks at San Quentin. Next worst is Folsom SHU II, which is slightly quieter due to a prison rule requiring the use of earphones with televisions, radios and stereos. Hardly quiet, but more tolerable, are the two more modern facilities, the Adjustment Center at San Quentin and SHU II at Folsom. These buildings are less noisy because they are divided into separate floors. In the cell blocks, consisting of five stories of acoustically unitary space, sound reverberates freely, magnifying noises of all kinds. The cell blocks are devoid of any sound absorbing material.

23. The sources of bedlam are as varied as the activities performed within the units. Radios and televisions blare. Gates clang open and shut. Inmates, held under conditions of "isolation" in which they cannot see each other, shout at the top of their voices in attempts to communicate with their fellows. An acoustics expert scientifically measured sound levels prevailing in a San Quentin B Section cell and found that the typical average daytime sound level is in the range of 70 to 75dBa, a level he likened to a noisy vacuum cleaner or a freight train at a distance of about 100 feet. The expert further stated that while conducting these tests, he was at times unable to make himself understood, even by shouting, with a guard standing only about 15 feet away. After midnight, dBa levels drop, reaching an average low in the range of 60 dBa between 5 and 6 o'clock a.m. This compares with a noisy office.[15]

---

12. Standing water also causes operational problems. An inmate testified that his San Quentin East Block tier was left without heat when a tier officer was unable to switch on the heating system due to three feet of water standing in the basement.

13. Robert Dacy, a former Folsom SHU II lockup inmate, testified that his cell was equipped with a 40 or 60 watt bulb. Defendants presented no evidence to suggest that other cells differ. A report introduced by plaintiffs as Exhibit 56 states that cells are generally equipped with a 75 or 100 watt bulb at San Quentin.

14. Some inmates use homemade shades made of materials such as cardboard to dim their lights. They do this from a desire to obtain privacy or to sleep.

15. The maximum noise levels permitted by ACA standards are 70 dBa in the daytime and 45 dBa at night. It should be noted in this regard that the uncontradicted test results showed, in addition to the *average* levels mentioned in the text, peaks as high as the mid to upper 80's during the day and the low 70's at night.

24. The unceasing racket exerts a profound impact on lockup inmates, some of whom consider it to be the single worst aspect of their confinement. Many shove paper, erasers, and other foreign objects into their ears in an attempt to shut it out. Noise contributes to the great difficulty many experience in sleeping. Doctors at both prisons testified that the "relentless" roar adversely affects the mental health of segregated inmates. The noise dulls the thinking of the prisoners and even damages the hearing of some.

### G. Electrical Systems

25. The electric wiring in both prisons is antiquated, and would not meet the most general of building codes. In the cell blocks, wiring has been altered to enable inmates to use multiple appliances within their cells. The result has been characterized as an "electrical nightmare." Connection boxes are not covered, many connections are made in open space, and bare wires are visible. In many cells, outlets dangle by exposed wires. Electric wires are also exposed in showers at San Quentin. San Quentin lockup inmates lacking running hot water in their cells employ "stingers," electric coil devices, to heat water. All of these conditions entail serious dangers of electrocution. In addition, the power systems in lockup units at each prison are overloaded. Outages are common.

26. The many exposed wires create a severe fire hazard. The danger is particularly acute in the "pipe chase" service areas, where wires can become wet due to leaky plumbing. The service areas display visible evidence of fires. Inmates also suffer burns because very often their cells have no functioning switches and they must turn out the light by unscrewing the bulb by hand. The electrical systems in lockup units of each prison need complete remodeling.

### H. Fire Safety

27. Fire hazards abound in lockup units at both prisons. These include the electric wiring, described above, the cell bar coverings, described above, and the many flammable materials stored inside inmate cells. Minor fires are relatively frequent occurrences within lockup units, largely because inmates employ "burning" as a technique for protest or just to get attention. Arson directed at specific inmates is a cause of fire as well. Despite the concrete and steel composition of the cell block structures, tests show that fires can rage extremely hot, reaching temperatures exceeding 2000° Fahrenheit.

28. In the light of these hazards, fire preparedness at both prisons is very poor. Many essential firefighting resources are lacking.[16] None of the lockup units has a sprinkler system. Only the San Quentin Adjustment Center has smoke detectors. The ventilation systems are inadequate to remove the smoke that accumulates in the upper tiers of cell blocks during even minor fires. Lockup inmates receive no instructions for procedures to be followed in the event of a serious fire, nor do they participate in fire drills. Evacuation would quickly become difficult or impossible during such a fire due to physical conditions. Many inmates would have to travel substantial distances to reach fire exists. Cell bars would swell with heat, making the doors difficult or impossible to open without the so-called "Jaws of Life" apparatus. Certain keys needed to open some cells are not kept in the units at all times, and the necessity of retrieving them could occasion further delay.

29. All of these factors create a substantial risk that a major fire will break out in one of the segregated units, killing tens or hundreds of inmates. Such a tragedy has yet to occur, though there has been at least one fatal fire in lockup during the pendency of this action. At San Quentin on May 30, 1981, two inmates died of

---

**16.** These include self-contained breathing apparatus (Folsom) and built-in firepipe stands (San Quentin).

smoke inhalation. In that instance, the metal in the cell door expanded and the door when unlocked could not be opened.

### I. Earthquake Safety

30. San Quentin is located in an earthquake-prone geographic zone. Structural deficiencies amounting to seismic hazards have been identified in two San Quentin buildings used to house segregated inmates: East Block and South Block. South Block is particularly suspect due to renovations that have added features of low structural integrity such as free-standing concrete partitions.

### J. Clothing, Laundry and Bedding

31. California state-authorized prison inmate clothing falls into two categories: "whites" (underwear, socks and towels) and "blues" (shirts and jeans). Present prison policy calls for lockup inmates to receive one exchange of both types every week.[17] In practice, laundry exchange is often not accomplished weekly.[18] Delays in laundry exchange are particularly troublesome at San Quentin, where inmates complain of having gone for as long as five months without a change of blues, and for weeks without a change of whites. Such delays have been caused by boiler failures, and by "lockdowns" of the general prison population, which deprive the laundry of its work force. When clothes are exchanged, inmates sometimes receive items that are torn, that have broken zippers, or that do not fit.

32. Plaintiffs are commonly assigned to cells furnished with mattresses that are dirty and foul-smelling, stained with water, urine, mildew and food. Mattresses in this condition are not subject to exchange. Some are infested with bedbugs. Almost all are "flat" as a result of long use. Lockup cells commonly lack pillows, and pillows that are present are frequently in poor condition, tattered and leaking. Blankets issued to lockup inmates are often filthy and torn.

### K. Personal Hygiene

33. Segregated inmates at both prisons are denied routine access to the most fundamental requirements for sound personal hygiene: showers and hot running water. Institutional policy permits segregated prisoners to shower indoors two or three times weekly. In addition, some prisoners have an opportunity to shower outdoors in the course of "exercise."[19] Like laundry exchanges, showers are not always provided as often as they are supposed to be. Lockup inmates have on occasion been locked in their cells without showers for up to three weeks. More commonly, showers are restricted to about one per week due to faulty boilers, a lack of shower space, or a lack of guards for escorting inmates to and from the showers. The Court credits the testimony of former San Quentin Warden Pulley, who stated that the lack of sufficient showers contributes to the overall "inhumane" conditions now prevailing in lockup.

34. The shower facilities themselves are revolting. Many, particularly in the five-tier cell blocks, are simply converted cells without ventilation of any kind. Due to accumulated filth and clogged drains, ponds of stagnant water commonly stand on the shower floors. This condition causes inmates to slip and fall, and also fosters the spread of mosquitoes, fungus, mold and mildew, all of which are prevalent. Prior to issuance of this Court's preliminary injunction, inmate tier tenders were

---

**17.** Inmates also receive a prison-issue blue denim jacket that is apparently not subject to exchange for laundering.

**18.** A standard "essential" for ACA accreditation of a prison is that inmates must receive an exchange of clothing at least three times weekly and a clean towel daily.

**19.** The adequacy of this opportunity was not established. The record does not, for example, show whether any hot water is available for such showers. The evidence at trial indicates that inmates are not permitted to bring items such as towels with them onto the exercise yards where the outdoor showers are located. Not all San Quentin exercise yards are equipped with showers.

not generally permitted to clean the showers. Since entry of the injunction, sanitation in the showers has improved in some lockup units.

35. No five-tier cell block used to house lockup inmates at San Quentin has hot running water in its cells.[20] Thus, inmates in these cells may obtain access to hot running water for hygienic purposes as little as one time per week. As one consequence, inmates commonly resort to the use of "stingers" to heat water in their sinks, a practice that is a fire hazard, an electrocution hazard, and a severe power drain on the overloaded electrical systems.

### L. General Sanitation

36. The infrequency of access to hot running water is especially distressing because lockup inmates must spend their days and nights confined in the midst of deplorable filth. All segregated inmates are fed in their cells, but they are given no wastebaskets or other containers in which to store solid refuse. They are expressly instructed to throw all rubbish out onto the tiers or floors in front of their cells, where it is later swept away by inmate tenders. The tiers and floors are not regularly mopped, and are encrusted with the remnants of years of deposited waste matter. Garbage can remain for hours on the tiers or floors and also, in the five-tier units, on the bottom of the cell block, where it accumulates after the tiers are swept. Waste material is removed from the bottom of the cell blocks by sweeping and hosing, a method grossly deficient by public health standards. Moreover, the gutters become plugged with rotting food and excess paper, allowing water to back up and causing additional bad odors. A correctional counselor employed at San Quentin likened the constant smell in his unit to that in a "recently-used toilet."

37. Lockup cells are also filthy. Contributing factors include the in-cell feeding system, chronic toilet backups as well, often, as the conduct of inmates themselves. However, as to the last, cells are not always cleaned between occupancies and inmates often cannot obtain necessary cleaning materials such as soap and scrub rags or brushes. Even diligent application of such materials cannot remove all of the grime accumulated on the floors, walls, and bars of the cells.

38. The two smaller, more modern units are cleaner than the five-tier cell blocks, which may be too large and dilapidated to be returned to a satisfactory state of cleanliness. The total lack of sanitation prevailing in the cell blocks serves as a constant indecent reminder that the residents are regarded and treated as caged animals, not human beings.

### M. Pests

39. Lockup inmates at San Quentin and Folsom are plagued by a variety of pests that thrive upon the accumulated filth. Folsom SHU II tiers are infested with cockroaches and mice. Rats enter the first tier gutters to feed upon the refuse collected there. The San Quentin cell blocks are infested with all of these, plus flies and mosquitoes.[21] Birds fly in and out of unscreened windows in the segregation cell blocks of both prisons, where they inhabit the tops of the units. All these infestations pose a serious danger to the health of inmates. In the face of this danger, defendants bring in outside contractors in vain attempts to exterminate. Despite strong recommendations from state sanitarians, neither prison has even one full-time employee charged with the task of alleviating the enormous pest problems.

### N. Food

40. All lockup inmates eat all of their meals in their cells. Meals are prepared in central kitchen facilities used to support prison dining generally. Serious deficien-

---

**20.** In-cell "hot and cold running water" is an "essential" ACA standard for prison accreditation.

**21.** One inmate testified that he was forced to erect a cardboard barrier across the front of his cell to prevent rats from entering.

cies in sanitation and active mouse and insect infestations in the San Quentin prison kitchen were documented in the findings and conclusions of the court in *Wilson v. Deukmejian*, No. 103454, at 10–14, 19 (Cal. Superior Ct. filed Sept. 13, 1983), which concluded that conditions there constitute "a threat to the physical health of the inmates and fall below contemporary standards of decency." From the evidence presented here, this Court agrees. The evidence established a number of noisome practices and conditions in addition to those remarked upon in *Wilson:* Examples include open and exposed meats in an unclean, improperly sealed meat cooler and meats stored at substandard temperatures, between 55 and 60 degrees, providing an ideal medium for food-borne disease-producing bacteria.

41. Bad as San Quentin kitchen conditions are, conditions in the kitchen facility at Folsom are, in the words of an expert who inspected both kitchens, "incredibly worse." Among his uncontradicted observations were: (1) an active infestation of rats;[22] (2) an active infestation of both roaches and flies; (3) pools of standing water in the kitchen; (4) inadequate ventilation, resulting in heavy deposits of grease and grime on exposed surfaces, and condensation dripping from those surfaces, potentially into food; (5) exposed electrical wires; (6) unsanitary, unclean food contact surfaces; (7) dried food residues on food preparation equipment; and (8) greasy, slippery floors made of porous rather than impervious materials. The walls are composed of granite, and cannot be adequately cleaned. The expert's testimony was corroborated by that of a highly credible inmate witness, a physician prior to entering prison life. This inmate also testified that while working in the Folsom kitchen, he was sometimes instructed to use cheese or meat in sandwiches even though it was spoiled. He further stated that during several periods lasting two or three days, large numbers of inmates complained to

him of symptoms of stomach cramps, diarrhea, and vomiting resembling those characteristic of food poisoning. Prison medical logs do not record any such episodes. However, evidence indicated that such outbreaks would not necessarily be recorded.

42. For in-cell feeding, food is often left uncovered during delivery. This fosters the growth of bacteria. Food often arrives contaminated with foreign objects such as roaches, hair, and, incredibly, bits of plastic from shoes.

43. This case involves no claim that food served to lockup inmates is nutritionally deficient. Nor would such a claim be supported by the evidence. However, the evidence amply demonstrates that the food served to segregated inmates in both prisons is stored, prepared and served under conditions so unsanitary that the food adversely affects the health of the inmates.

O. *Exercise*

44. The confinement to which segregated inmates are normally subject, locked inside a cell less than 50 square feet in dimension, allows very little meaningful exercise and is physically debilitating. Prisoners consistently suffer from extreme muscular soreness and weakness. One inmate, held in lockup without exercise for 41 days, credibly testified that when released from custody at the end of that period, he experienced great difficulty in walking the necessary two and one-half blocks to freedom.

45. Most SHU, management control, and protective custody inmates are provided with some minimal opportunity to engage in out-of-cell exercise. "Administrative segregation" inmates are not. "Exercise," in the case of all plaintiffs, means outdoor exercise, because no indoor facilities are available. If it rains during a scheduled exercise period, the prevailing policy is either to cancel exercise (Folsom) or to afford inmates the option of forgoing

---

**22.** An "infestation" in this context refers to both the presence and the growth and reproduction of a species of organism in a given environ- ment. Mere presence by itself is referred to as "activity."

exercise (San Quentin). . If rain begins while inmates are in the exercise yard, they must still remain there until the end of the scheduled exercise period.[23] For this reason, on threatening or inclement days inmates bring with them to the yard plastic bags with a slit in the top, locally known as "San Quentin raincoats." Though officially considered contraband, this makeshift apparel is the only rain gear available to lockup inmates, and appears generally to be permitted by the guards.

46. In the preliminary injunction, the Court ordered that

[u]nless precluded by temporary and compelling exigencies, each prisoner shall be provided with outdoor exercise at least one (1) hour every day or two (2) hours every other day, for a minimum total of eight (8) hours a week, or at least three (3) times a week, for a minimum total of ten (10) hours a week.

*Toussaint v. Rushen,* 553 F.Supp. at 1385. Defendants admit that a substantial number of segregated inmates do not receive this much exercise.[24] The remainder are accorded at best the bare minimum. None exercise daily. Exercise is commonly curtailed or eliminated during institutional "lockdowns," which may be completely unrelated to the behavior of lockup prisoners. The record shows that some inmates endure periods of weeks or even months with no out-of-cell exercise whatever. For most, exercise is irregular. The exercise accorded is insufficient in the case of most lockup prisoners to offset the severely debilitating effects of continuous confinement in a cramped cell.

## P. *Visitation*

47. The visits allowed inmates of California prisons fall into three categories. The first is "non-contact visits." In these, the inmate is shackled and speaks with his visitor by telephone; the inmate and the visitor view each other through a glass or plastic barrier. The second is "contact visits." In these, the inmate and his visitor sit together in a common room. They are permitted to touch each other and, in limited measure, to kiss. The third is "family visits," also referred to as "conjugal visits." In these, the inmate and his visitor (to whom he must be legally related) spend a night or a weekend together in a specially designed housing facility.[25] Sexual relations between spouses are permitted.

48. Family visiting and contact visiting are considered by prison authorities to be "privileges" that may be withdrawn. With a few exceptions, plaintiffs as a class have very limited privileges. They are not allowed family visits. Normally they are permitted relatively frequent contact visits; however, SHU inmates in San Quentin South Block may have contact visits only if they are free of serious disciplinary infractions for a substantial period, officially one year. Other South Block SHU inmates and "administrative segregation" inmates commonly receive only non-contact visits. Many inmates and visitors regard non-contact visiting as an unsatisfactory or unpleasant mode of visitation.

49. Physical conditions of visitation are the subject of numerous complaints. At Folsom, weekend, holiday, and evening visitation are not available to lockup inmates because the over-taxed facilities are allocated to general population inmates during these choicer time slots. Visitors often experience lengthy delays and unpleasant searches by prison staff prior to contact visits. Delays are also sometimes caused by a lack of sufficient guards to escort inmates to and from the visiting rooms.

---

**23.** Use of the term "yard" to describe the exercise areas is a euphemism. The areas allocated to lockup inmates are quite small, generally only slightly larger than a half basketball court. They are paved and surrounded by a chain link cage fence. Facilities are minimal.

**24.** The inmates conceded to be receiving less than the required exercise are those in San

Quentin East Block and C and D Sections of South Block.

**25.** Evidence indicated that San Quentin is one of very few maximum security prisons in the nation to allow conjugal visiting for any of its inmates.

Scarcity of facilities sometimes requires contact visits to be involuntarily abbreviated.

50. Visiting is an important penological tool, partly because it preserves community and family ties and gives inmates something to work for and look forward to following release from incarceration. Incidents of violence in the visiting room are rare, because inmates tend to be on their best behavior. However, the smuggling of contraband, particularly drugs, persists as a problem inherent in contact visits despite the thorough searches performed by correctional officials.

### Q. *Telephone Service*

51. Lockup inmates have no access to telephones except in emergencies. Permitting lockup inmates some such access on a reasonable, monitored basis would pose little institutional security risk.

### R. *Legal Research Materials*

52. Segregated inmates are not allowed inside law libraries at either prison. They may conduct legal research only by means of a "paging" system. To use this system, they must request books two or three at a time from the central libraries. Often such requests are overlooked or responses are delayed. Once obtained, books can be kept for only brief periods. This system greatly prolongs the time required to conduct elementary legal research even for an inmate with some formal legal training. For most, effective legal research under the present paging system is virtually impossible. No qualified legal assistants are available to help lockup inmates.

53. The prison libraries themselves are incomplete and over-taxed. Volumes are missing from most commonly-used sets, as are recent supplements to codes. Libraries at both prisons lack basic treatises and instructional texts. Demand for books in

the existing collection at San Quentin is so great that an unmanageable backlog of hold requests has accumulated. The library director stated that he will be forced henceforth to abolish the system of hold requests. Lockup inmates will instead be required to request desired books continuously until the books happen to be available. Lockup inmates have no way to learn of the return of volumes they seek.

### S. *Idleness*

54. Lockup inmates at San Quentin and Folsom may not participate in organized "programs" such as vocational training, education, or hobbies. Except for a few tier tenders, they may not hold jobs. Communication with inmates in nearby cells is possible but difficult. Daily activities typically available to an inmate in segregation include watching television (if he has one), listening to radio or stereo, or reading whatever printed materials he can secure and store in his cell.[26] Lockup inmates typically feel extreme boredom. Some find this boredom to be the worst aspect of life in segregation.

55. The overwhelming weight of testimony, including that of knowledgeable California prison officials, leaves no doubt that the long-term confinement of large numbers of inmates without work or other program is an unsound penological practice. The evidence established that many idle lockup prisoners suffer psychological pain and loneliness. Plaintiffs also established that prolonged idleness adversely affects the mental health of a number of inmates. The absence of program spawns tension and violence; it increases rather than decreases antisocial tendencies among inmates.

### T. *Health Care at Folsom*[27]

56. The medical staff at Folsom consists of five physicians, two psychiatrists

---

**26.** Writing, though theoretically possible, is in practice very difficult because of poor lighting, lack of any adequate writing surface within the cells, noise, etc.

**27.** The constitutionality of health care provided to lockup inmates at San Quentin is not at issue in this case. That issue is among those presently pending in *Marin v. Rushen*, No. C 80–0012 MHP (N.D.Cal.).

and a psychologist. One of the physicians is Dr. R. Grant Jordan, Chief Medical Officer at the prison. Dr. Jordan devotes about one-half of his time to administrative duties, and one-quarter to psychiatric treatment of inmates. At the time of trial, one of the remaining physician positions stood vacant following the incumbent's retirement under a cloud of extremely serious negligence charges. Dr. Jordan characterized the entire medical staff, responsible for the care of approximately 3,500 inmates, as "overtaxed." As a result, virtually all screening of inmate complaints is performed by medical technical assistants, or "MTA's." MTA's conduct sick call in the lockup units daily; a physician passes by the cells only once each week. MTA's administer non-prescription drugs and, generally speaking, determine which inmates may be released from the cells for examination by a physician in the prison infirmary. However, lockup inmates will, if they insist, be taken to see a doctor even if not recommended by an MTA.

57. In comparison with other parts of the prison, the Folsom infirmary is relatively clean. The evidence does not, for example, show any vermin infestation. But sanitation is not satisfactory from a medical point of view. For one specific example, the area in the infirmary designed for post-operative care is located next to a utility room with a mop sink. The infirmary surgical suite lacks aseptic ventilation adequate for major surgeries. Inmates requiring major emergency surgery are immediately transported to the University of California, Davis hospital in Sacramento, about one-half hour away. Inmates requiring major elective surgery must await transfer to the California Medical Facility at Vacaville, or to a hospital specializing in the particular procedure.[28] A wait of approximately six months is normally required for a transfer of this kind, although urgency of

need is monitored. Inmates must also await transfer if they have a medical condition requiring special diet. The only special diet available at Folsom is one designed for treating ulcers. A substantial backlog of inmates awaits dental treatment at any given time.

58. Like the medical staff, the psychiatric staff is overburdened. Primary attention is devoted to the treatment of emergency cases, typically acute psychotics. Minimal individual and no group therapy is provided lockup inmates, even though such therapy is frequently among the principal recommendations of sentencing courts and parole boards. A very high percentage of lockup inmates suffer from significant psychiatric problems. Some of these receive no treatment.

59. Dr. Jordan believes, and the Court finds, that the quality of health care at Folsom is less than adequate and could be improved in many ways. Additional staff are needed, including physicians, psychiatrists, nurses, and clerical workers. The last are needed to replace inmate workers who now have access to the medical records of other inmates, an undesirable practice. Less reliance should be placed on MTA's, and MTA's should have standing orders. Physician and psychiatrist performance would benefit from formal peer review, not presently conducted. However, the Court finds, based on the testimony of Dr. Jordan, that while there may be isolated exceptions, Folsom provides most strictly "necessary" treatment on a timely, medically sound basis.

U. *Violence*

60. Lockup units at San Quentin and Folsom are counted among the most violence-racked correctional facilities in the United States.[29] In part, this is due to the California Department of Corrections poli-

---

**28.** Dr. Jordan defined "elective" surgeries as those needed to remedy conditions that are not life-threatening and do not produce major discomfort. Examples he gave were hernias and gallstones. Dr. Jordan stated that "elective" conditions are sometimes quite serious.

**29.** Despite alarming overall levels of violence, the record contains no evidence that sexual assault is a particular problem in lockup except in instances where segregated inmates are double-celled.

cy of concentrating the most violence-prone offenders in these two institutions. In part, it is caused by the horrendous physical conditions, including double-celling. In part, it is due to the crowding of both facilities beyond design capacity. In part, it may be due to the fact that lockup units have no programs. But in large measure, it originates in the violent propensities of segregated inmates themselves.

61. Segregated inmates manufacture and secrete weapons with exceeding resourcefulness. Specially-trained security officers search lockup cells on a frequent, though random, basis, and confiscate numerous stabbing and clubbing implements. Lockup inmates are thoroughly searched on virtually every occasion they leave their cells. They are constantly monitored by guards heavily armed with both a shotgun and a rifle.[30] Despite all of these precautions, assaults on inmates in lockup are common.

62. Violence among inmates is frequently channeled through social organizations. Prison authorities and many inmates term these organizations "gangs" and ascribe to them colorful names such as "Aryan Brotherhood," "Mexican Mafia," and "Black Guerrilla Family." Expert sociologists who testified at trial expressed the view that these groups are neither as stable nor as well-organized as prison officials believe. Alliances and enmities among inmates shift constantly. The institutional labeling of an inmate as a gang member frequently proves to be a self-fulfilling prophecy. Fellow prisoners tend to accept the label, forcing the inmate to ally himself with others similarly labeled in order to survive. Inmates seeking to identify themselves with a gang sometimes perform acts of violence in order to gain "membership." Factional strife and leadership struggles within gangs occasion violence, as do battles between rival gangs.

63. Both inmate and staff bystanders have been wounded or killed by stray gunfire, an alarming commentary upon the wisdom of maintaining guns within the units. *See supra* note 30. On occasion, gunfire has been used unnecessarily. The evidence does not, however, establish that mistreatment or unjustified violence directed at inmates by correctional officers is in any way countenanced by defendants. While shocking incidents have occurred, they have been carefully investigated.[31]

## V. Overcrowding

64. Most of the Court's findings relative to crowding in lockup units have already been stated. The parties stipulated at trial that all California correctional facilities except one are seriously overcrowded. During the pendency of this action, San Quentin has housed 3,800 inmates in its 2,712 cells, and Folsom has housed 850 more than its 2,058 design capacity. Such overcrowding strains all environmental systems within the institution, and makes it difficult to provide decent conditions of confinement to lockup inmates.

## W. Standards Governing Placement in Segregation

65. For an inmate at San Quentin or Folsom, the consequences of assignment to segregation are harsh. The inmate is substantially deprived of human contact (unless double-celled). He spends days and nights without respite in a dim, noisy, mal-

---

**30.** The Court heard convincing testimony that the constant use of firearms to cover inmates inside housing units is very rarely encountered in prisons outside California. Credible evidence also tended to show that the continuous presence of armed guards aggravates rather than mitigates the violent tendencies of inmates so confined. On the other hand, evidence also indicated that given the extremely violent tendencies of the present lockup population, removal of guns from the units would entail at least some element of risk.

**31.** One such incident took place on August 18, 1983, when a shotgun blast fired by a guard at close range permanently blinded inmate Anthony Martinez. In that instance, prison authorities, acting on a tip, conducted an investigation that uncovered the falsity of the explanation given by the guard for the shooting. The record does not show the nature of any disciplinary action taken, but reveals that the incident was referred to civil authorities for prosecution.

odorous cubicle the size of a dog kennel. Probably this cubicle is infested with vermin. Sometimes it is cold as well. The inmate is denied "privileges" such as family visits and telephone calls. He has no work or program.

66. Because lockup inmates cannot hold jobs or take part in other programs, they cannot earn the full measure of worktime sentence credit prescribed by Cal.Penal Code § 2933(a) (West's 1984 supp.). Although California law requires good-time credit to be afforded to inmates held in segregation without program, *see id.* §§ 2933(a), 2931(a), the evidence at trial did not establish that such credit is invariably afforded. Moreover, the inability to participate in a program reduces the amount of good-time credit that can be earned by any inmate, whether or not he is subject to the worktime sentence credit law. *See* Cal.Penal Code § 2931(c) (West's 1984 supp.) (one-fourth of possible good-time credit is "based solely upon participation in work, education, vocational, therapeutic or other prison activities"). In addition, the inability to participate in a program commonly retards the parole dates set for lockup inmates by making it impossible for them to comply with parole board recommendations. Thus, in the majority of cases, assignment to lockup significantly extends the total amount of time an inmate must spend in incarceration. The Court bases this finding not only upon a reading of applicable California law, but also upon the specific testimony of present and former inmates who appeared at trial.[32]

67. In 1976, the Court ruled that inmates at San Quentin and Folsom had been segregated for "administrative" reasons arbitrarily and without observance of procedures required by the due process clause of the Fourteenth Amendment.[33] *Wright v. Enomoto*, 462 F.Supp. 397, 400–04 (N.D. Cal.1976). Accordingly, the Court ordered that inmates be provided with five procedural safeguards prior to assignment to segregation: (1) prompt written notice of the reasons for proposed segregation; (2) a fair hearing held no later than 72 hours after placement in segregation; (3) representation by a counsel-substitute when prison officials determine that the inmate is illiterate or the issues complex; (4) an opportunity to present witnesses and documentary evidence, unless prison officials determine in good faith that permitting such evidence would be unduly hazardous to institutional safety or correctional goals; and (5) a written statement of reasons for any decision to segregate. *Id.* at 404–05.

68. The order in *Wright v. Enomoto* has not received full compliance. Many prisoners are still placed in segregation without timely notice or hearing. The notice often is not, as required by the Court's

---

**32.** Kenneth Raines, 25, first arrived at San Quentin February 14, 1983, to begin serving a sentence for grand theft. He was immediately placed on "administrative segregation" for orientation. As he was not a Level IV inmate, he was transferred to San Quentin Ranch (a minimum security facility) 18 days later. Subsequently, while participating in a work furlough program, Raines was hospitalized following an auto accident. Correctional authorities found Raines "guilty, with an explanation" of failure to return, docked him 10 days' good time credit, and transferred him to Vacaville, where he was mistakenly categorized as a parole violator. Shipped back to San Quentin July 20, Raines was again placed in segregation. At San Quentin, he was first told that he would be released August 10. He was not released on August 10, however, because his segregated status and attendant lack of program prevented him from earning the further work credit on the basis of

which the August 10 date had been calculated. On August 10, when Raines learned he would not be released, he suffered a nervous breakdown. He was eventually released on August 30.

**33.** Specifically, the Court stated that:

Defendants have consistently confined prisoners in maximum security segregation for administrative reasons without first giving them any meaningful hearing. Typically, the inmate is transferred to a maximum security unit before he is brought before the Classification Committee. In many cases, prisoners have been confined in solitary for days—sometimes for weeks—before any hearing. In some cases, inmates have been so confined and not told the reasons, even informally, until appearance before the Committee.

*Wright v. Enomoto*, 462 F.Supp. at 400.

order (462 F.Supp. at 404), "in sufficient detail to enable the prisoner to prepare a response or defense." For example, one "notice" states in full: "You have been placed on Administrative Segregation Status pending investigation that your continued presence in the general population poses a threat to the safety and security of the institution." Hearings, too, tend to be perfunctory. As a consequence, significant numbers of inmates continue to be subjected to the privations of lockup arbitrarily and without evidence adequate to establish a reasonable belief that the inmates present a danger to others or a threat to the security of the institution.[34] *See Wright v. Enomoto*, 462 F.Supp. at 403. Frequently the decision to segregate is based on unverifiable hearsay or "confidential information" from a source of unproven reliability identifying the inmate as a gang member.[35] The Program Administrator for a lockup unit at San Quentin admitted that gang membership determinations are generally reached prior to the classification hearing.

69. Equally disturbing is the fact that inmates, once assigned to lockup, are retained there for inordinately long periods without any renewed justification for continued segregated confinement. As of mid-August, 1983, 548 inmates had been held continuously in lockup for more than one year, and 249 had been so held for over two years. Many are retained there solely because the original belief that the inmate is a "gang leader" has not been disproven. A vicious cycle emerges whereby the inmate, identified as a gang member, is assigned to exercise in the same yard with other reputed members of the gang, and through his association with these inmates the gang membership identification is perpetuated. According to prison officials, an inmate cannot "disprove" an established gang identification without the aid of other inmates or staff. Consequently inmates frequently lose all hope of securing release from lockup.

70. Moreover, even inmates cleared for return to the general population remain confined in lockup, with its attendant prohibitions of work and denial of "privileges," for substantial periods due to lack of cell space in the rest of the prison. At the time of trial, approximately 169 such "holdover" inmates were confined in segregation at San Quentin alone.

## X. *Compliance With Court Orders*

71. The record demonstrates that defendants have often failed to effect prompt and proper compliance with orders of this Court. In addition to the *Wright v. Enomoto* order respecting placement in segregation, orders that have not been obeyed or that have been obeyed following excessive delay include those provisions of the preliminary injunction dealing with double-cell-

---

**34.** Examples of arbitrary or inadequately documented lockups testified to by plaintiffs' witnesses include: A prisoner locked up as a gang member because his two brothers were so locked up; a prisoner locked up because he was observed talking to a gang member; a prisoner retained in lockup based on "confidential information" after being found not guilty of the offense of "pressuring activity;" a prisoner segregated because he once possessed a weapon, although he had since been in the general population; a prisoner locked up because he had once previously been locked up in another institution; and a minimum security prisoner transferred to San Quentin and locked up indefinitely following an argument with a guard. Two inmates who testified at trial are segregated, according to defendants, primarily because they chose to exercise in a yard used by reputed

members of the "Aryan Brotherhood" and "Mexican Mafia." Despite defendants' strenuous argument to the contrary, the Court is not persuaded that these examples represent isolated instances.

**35.** A witness with 44 years of experience in the fields of criminal justice and corrections testified that confidential inmate informants are "highly unreliable" and should not be credited without independent corroboration. The weight of evidence indicated that such informants are commonly manipulative and untruthful. Prison officials themselves admit that definitive gang member identification is almost impossible. Yet alleged gang members continue to be placed and retained in lockup based on documentation that is, by the admission of one official, "sketchy."

ing,[36] showers,[37] and exercise.[38] Correctional officers testified in court that they were unfamiliar with various provisions of the Court's orders during a contempt proceeding recently brought by plaintiffs. Defendants have yet to establish an adequate mechanism for ensuring compliance with the preliminary injunction and other Court orders. Greg Harding, the official charged by defendants with supervising compliance, testified that his authority is limited to developing plans to facilitate compliance, and does not include any power to investigate alleged violations of the injunction. Further obstacles to effective compliance spring from the fact that defendant Wardens, while well-intentioned, frequently prove unaware of actual events transpiring within the lockup units of their institutions.

## III. CONCLUSIONS OF LAW

### A. *Segregation Cells*

 The cells in which plaintiffs are housed range between 45.5 and 56 square feet. Plaintiffs note that this is considerably less space than the minimum recommended by standards of bodies such as the American Correctional Association. However, it is an error to "constitutionalize" such standards. *Hoptowit v. Ray*, 682 F.2d 1237, 1249 (9th Cir.1982); *Newman v. State of Alabama*, 559 F.2d 283, 288 (5th Cir.1977); *see also Rhodes v. Chapman*, 452 U.S. 337, 348 & n. 13, 101 S.Ct. 2392, 2400 & n. 13, 69 L.Ed.2d 59 (1981). Plainly, cells of the size involved here are less than ideal places in which to confine human beings on a round-the-clock basis. But the Court concludes that, if all other conditions are satisfactory, segregating inmates in the cells presently used for that purpose at San Quentin and Folsom is not inconsistent with minimum contemporary standards of decency. *See Laaman v. Helgemoe*, 437 F.Supp. 269, 310 (D.N.H.1977). Consequently the use of such cells does not by

itself constitute cruel and unusual punishment. *See Rhodes*, 452 U.S. at 346–47, 101 S.Ct. at 2399–2400; *Hoptowit*, 682 F.2d at 1246.

 The evidence established that in addition to the cells regularly used to confine lockup inmates, defendants also sometimes employ "quiet cells" with solid outside doors. The use of such cells with the doors closed constitutes cruel and unusual punishment that violates the Eighth Amendment. *Hoptowit*, 682 F.2d at 1257.

### B. *Double-Celling*

In *Rhodes v. Chapman*, the Supreme Court held that the double-celled confinement of segregated inmates at the Southern Ohio Correctional Facility (SOCF) did not violate the Eighth Amendment. *See* 452 U.S. at 342 n. 3, 349 n. 15, 101 S.Ct. at 2396 n. 3, 2401 n. 15. Other courts have reached similar conclusions. *E.g., Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 1001 (3d Cir.1983), *cert. denied*, ── U.S. ──, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984); *Ruiz v. Estelle*, 679 F.2d 1115, 1151 (5th Cir.1982); *Capps v. Atiyeh*, 559 F.Supp. 894, 907 (D.Ore.1982). However, conditions under which lockup inmates are double-celled at San Quentin and Folsom differ markedly from those prevailing at SOCF when *Rhodes* was decided. The Supreme Court characterized SOCF as a "topflight, first-class facility," and noted that "though small, the cells in SOCF are exceptionally modern and functional; they are heated and ventilated and have hot and cold running water and a sanitary toilet." *Rhodes*, 452 U.S. at 341, 348 n. 13, 101 S.Ct. at 2396, 2400 n. 13. San Quentin and Folsom are old prisons presenting the "deplorable" and "sordid" conditions the Supreme Court contrasted with those at SOCF. *See id.* at 352, 101 S.Ct. at 2402; *see also Union County Jail Inmates*, 713

---

**36.** Double-celling in excess of that permitted by the preliminary injunction was ordered terminated on August 3, 1983. It was not terminated until April 24, 1984, when a motion for civil contempt had been filed by plaintiffs.

**37.** Some lockup inmates at San Quentin still do not receive three showers per week as required by the preliminary injunction.

**38.** Defendants admit noncompliance with this provision. *See supra* note 24.

F.2d at 1001 n. 30. In these prisons, unlike SOCF, double-celling increases violence among inmates and causes intolerable stress and psychiatric problems. *Cf. Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. The constitutional significance of both distinctions was noted by the Ninth Circuit in affirming the double-celling provision of the preliminary injunction. *Toussaint v. Yockey*, 722 F.2d 1490, 1492–93 (9th Cir. 1984).

■ The Court concludes, based on the virtually unanimous testimony of witnesses at trial, that the double-celling of segregated inmates at San Quentin and Folsom under conditions now prevailing or likely to prevail in the foreseeable future is cruel and inhuman, violating the Eighth Amendment.

## C. *Heating and Ventilation*

■ It is clear that adequate heating and ventilation are fundamental attributes of "shelter," which is a basic Eighth Amendment concern.[39] *See Ramos v. Lamm*, 639 F.2d 559, 566, 568 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Martino v. Carey*, 563 F.Supp. 984, 999 (D.Ore.1983). An institution must therefore provide all inmates, including segregated inmates, with "adequate" heat and ventilation. *See Hoptowit*, 682 F.2d at 1246; *Wright v. Rushen*, 642 F.2d 1129, 1132–33 (9th Cir.1981); *Newman*, 559 F.2d at 286; *see also Palmigiano v. Garrahy*, 443 F.Supp. 956, 961, 979 (D.R.I.1977), *aff'd*, 616 F.2d 598 (1st Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980). The evidence in this case established that, with the exception of a relative few inmates housed in the San Quentin Adjustment Center and Folsom SHU I, plaintiffs are not provided with either adequate heat or ventilation. This condition violates the Eighth Amendment.

## D. *Plumbing*

■ As an aspect of "sanitation," plumbing is a basic Eighth Amendment concern. *See Ramos*, 639 F.2d at 566, 568; *Martino*, 563 F.Supp. at 999. Consequently the plumbing in a facility used to house inmates, including segregated inmates, must be "adequate." *See Hoptowit*, 682 F.2d at 1246. The evidence established that the plumbing in most if not all of the units housing lockup inmates at San Quentin and Folsom is grossly inadequate. In fact, the leaking pipes and fixtures, clogged drains, rotting sewer lines, and other plumbing and sewage deficiencies are a major cause of the serious health hazards prevalent in lockup units of the two prisons. These conditions are inconsistent with human decency, and violate the Eighth Amendment.

## E. *Lighting*

■ Lighting is an indispensable aspect of adequate shelter and is required by the Eighth Amendment. *See Ramos*, 639 F.2d at 568; *Martino*, 563 F.Supp. at 999. The physically and mentally debilitating effects of a lack of adequate lighting were noted in *Palmigiano v. Garrahy*, 443 F.Supp. at 961. The Court will not "constitutionalize" any particular expert standard. Rather, in the context of this case, the Court concludes that each inmate must be afforded sufficient light to permit him to read comfortably while seated or lying on his bunk.[40] Many if not most lockup inmates are not furnished with this amount of light, in violation of the Eighth Amendment.

## F. *Noise*

■ An obligation to furnish inmates a reasonably quiet living space does not, strictly speaking, fall within any of the categories of basic Eighth Amendment concerns enumerated in *Hoptowit*, although it could well be regarded as a component of

---

**39.** Ventilation is also required as an aspect of "sanitation," another basic element of the decent treatment mandated by the Eighth Amendment. *See Hoptowit*, 682 F.2d at 1246.

**40.** It is to be noted in this regard that lockup inmates at San Quentin and Folsom lack any facility (except the toilet) other than their bunks on which to sit while confined in their cells.

the obligation to provide adequate shelter. However, the facts of this case leave no doubt that the constant level of noise is among the most intolerable conditions now endured by lockup inmates confined in the five-tier cell blocks at both prisons. The level of noise is so extreme that it adversely affects their hearing and mental processes. Constant exposure to such a level of noise inflicts pain without penological justification. It also contributes to the creation of "a total environment where debilitation is inevitable, and which is unfit for human habitation and shocking to the conscience of a reasonably civilized person." *Palmigiano*, 443 F.Supp. at 979.

Noise is a troubling problem because much of it is caused by plaintiffs, collectively. However, courts have not hesitated to declare unconstitutional other indecent prison conditions caused by inmates themselves. *See, e.g., Hoptowit*, 682 F.2d at 1250 (violence); *Ramos*, 639 F.2d at 572–73 (violence); *Martino*, 563 F.Supp. at 988–89, 991, 997, 999 & n. 7 (violence, sanitation); *Palmigiano*, 443 F.Supp. at 979. *But cf. Holt v. Sarver*, 309 F.Supp. 362, 378 (E.D. Ark.1970) (conditions held to be of less concern when "due to the conduct of the inmates themselves"), *aff'd*, 442 F.2d 304 (8th Cir.1971). The Court concludes that public conceptions of decency inherent in the Eighth Amendment require that plaintiffs be housed in an environment that, if not quiet, is at least reasonably free of excess noise.[41] The San Quentin Adjustment Center and SHU I at Folsom presently meet this standard. The five-tier cell blocks, including Folsom SHU II, do not.

### G. *Electrical Systems*

■ As an aspect of "shelter," a prison's electrical system falls within the purview of Eighth Amendment scrutiny. The denial of electricity to a segregated inmate's cell for a moderate period of time does not constitute cruel and unusual punishment. Electric wiring that presents a

continuous danger of death or serious injury from fire or electrocution is another matter. *See Ramos*, 639 F.2d at 570. Such a danger is present in segregation units at both San Quentin and Folsom. This condition violates the Eighth Amendment.

### H. *Fire Safety*

■ Safety from fire is an aspect of "shelter," and as such is properly an area of Eighth Amendment concern. Consequently, a prison "unquestionably has a duty to provide adequate fire safety for its inmates." *Ruiz*, 679 F.2d at 1153; *see Leeds v. Watson*, 630 F.2d 674, 675–76 (9th Cir.1980); *Santana v. Collazo*, 714 F.2d 1172, 1183 (1st Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). Lockup units at both prisons are replete with fire hazards. Evacuation procedures are nonexistent or, at best, untested. Moreover, in contrast to *Ruiz, see* 679 F.2d at 1153, the record in this case shows that multiple fire-related fatalities have occurred. The fire safety in the lockup units involved in this case is so blatantly inadequate as to violate the Eighth Amendment.

### I. *Earthquake Safety*

■ Seismic safety is also an aspect of shelter. However, the Court is not persuaded that forcing prisoners to reside within a building that is not earthquake-proof contravenes public notions of decency. Numerous Americans live and work within such buildings without any perception that their shelter is inadequate. The seismic hazards documented in this case do not violate the Eighth Amendment.

### J. *Clothing, Laundry and Bedding*

■ Clothing is a basic area of Eighth Amendment concern. *Hoptowit*, 682 F.2d at 1246; *Wright v. Rushen*, 642 F.2d at 1132–33; *Newman*, 559 F.2d at 286. Prisoners in lockup at San Quentin and Folsom are permitted only state-issued clothing

---

**41.** It is relevant to this conclusion that plaintiffs, owing to the circumstances of lockup confinement, lack any means of removing themselves from the surrounding din for even brief periods of time.

and a limited quantity of approved private clothing. See 15 Cal.Admin.Code § 3032 (1983). Defendants are under an obligation to ensure that this clothing is adequate and that it is adequately laundered on a regular basis. *Toussaint v. Rushen,* 553 F.Supp. 1365, 1379 (N.D.Cal.1983), *aff'd in relevant part,* 722 F.2d 1490 (9th Cir.1984). When laundry exchange is provided in accordance with defendants' internal policies, it is adequate. But at San Quentin, laundry exchange is not so provided. Weeks and months pass without affording lockup inmates an opportunity for clothing exchange. This violates standards of decency inherent in the Eighth Amendment.

■ Reasonably clean, sanitary bedding is likewise required by the Eighth Amendment. *See Ramos,* 639 F.2d at 570; *Toussaint v. Rushen,* 553 F.Supp. at 1379. The bedding issued to lockup inmates is frequently filthy and unsanitary. This condition is indecent, and violates the Eighth Amendment. Decency also requires that each cell be furnished with a clean, untorn pillow. Many lockup cells are not so furnished. This, too, violates the Eighth Amendment.

## K. *Personal Hygiene*

■ The fundamental requisites of sound personal hygiene are not directly listed among the Eighth Amendment concerns enumerated in *Hoptowit, Wright v. Rushen,* and *Newman.* However, the subject bears a clear relation to three such areas: shelter, sanitation, and medical care. *See Martino,* 563 F.Supp. at 999 ("[t]he provision of adequate means of hygiene, and the sanitary disposal of bodily wastes so that the wastes do not contaminate the cells, are constitutionally required"). Many lockup inmates at San Quentin have no hot water in their cells and are permitted indoor showers as rarely as once per week. Some regular access to a personal cleaning facility is critical for inmates such

as these, living amidst the conditions of filth that prevail in lockup units of both prisons. The Court concludes that minimum standards of decency require that lockup inmates without hot running water in their cells be accorded showers three times per week in facilities reasonably free of standing water, fungus, mold and mildew.[42] *See* 15 Cal.Admin.Code § 3343(f) (1983) (evidence that this represents standard of decency). As this requirement is not presently met, conditions of personal hygiene violate the Eighth Amendment.

## L. *General Sanitation*

A sanitary environment is a basic human need that a penal institution must provide for all inmates. *See Hoptowit,* 682 F.2d at 1246. Defendants do not dispute the fact that lockup units at San Quentin and Folsom are unsanitary. Rather, they argue that plaintiffs have not established that unsanitary conditions have made a substantial detrimental impact on their health. The Court cannot accept this defense. The evidence at trial of cells without solid waste containers, service areas stinking of raw sewage and human feces and tiers encrusted with rotting garbage, amply establishes that conditions of sanitation in the lockup units involved in this case are inconsistent with any standard of decency and present a serious hazard to the health of each plaintiff. *See Ramos,* 639 F.2d at 570; *Martino,* 563 F.Supp. at 1000. Such conditions violate the Eighth Amendment.

## M. *Pests*

■ Active infestation of vermin such as rats, mice, birds, and cockroaches is inconsistent with the adequate sanitation required by the Eighth Amendment. At least some lockup units of each prison are plagued by each of these. Such infestations are part and parcel of the general lack of adequate sanitation in the prisons, particularly the five-tier cell blocks. The failure of defendants to provide a reason-

---

**42.** Once again, it bears emphasis that the Court's conclusion is premised on the fact that the particular inmates who are plaintiffs in this case are locked in their cells around the clock and have absolutely no means of securing access to personal cleaning facilities outside their cells except those expressly allocated by prison authorities.

ably pest-free environment for lockup inmates violates the Constitution.[43]

### N. *Food*

Adequate food is a basic Eighth Amendment requirement. *Hoptowit*, 682 F.2d at 1246; *Wright v. Rushen*, 642 F.2d at 1132–33; *Newman*, 559 F.Supp. at 286. The food served to inmates is deficient under constitutional standards, even when nutritionally complete, if it is prepared under conditions so unsanitary as to make it unwholesome and a threat to the health of inmates who consume it. *E.g., Ramos*, 639 F.2d at 570–72 (holding food condition constitutionally impermissible even though no specific instance of inmate sickness cited); *see also Leeds*, 630 F.2d at 676; *Palmigiano*, 443 F.Supp. at 962–63, 987; *Laaman v. Helgemoe*, 437 F.Supp. at 309. The facts established in this case pertaining to conditions of food preparation and delivery are like those held to violate the Constitution in *Ramos*. As noted above, the kitchen operation at San Quentin has already been declared unconstitutional in a state court action, and the kitchen at Folsom is, if anything, worse. The Court concludes that the provision to lockup inmates of food stored, prepared, and served under the unsanitary and unhealthful conditions now prevailing violates the Eighth Amendment.

### O. *Exercise*

As mentioned at the outset, exercise is solidly established as a constitutional requirement for all prison inmates. *See Ruiz*, 679 F.2d at 1152. The Ninth Circuit has ruled that inmates who were members of the plaintiff class in this case, housed in segregation at the San Quentin Adjustment Center for a period of years, must be accorded outdoor exercise one hour per day, five days per week, weather and prison exigencies permitting. *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir.1979). On the other hand, a short-term denial of exercise to an inmate for disciplinary or security

reasons probably does not violate the Eighth Amendment. *See Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir.1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981); *Spain*, 600 F.2d at 200; *Martino*, 563 F.Supp. at 1000–01. The inquiry concerning the constitutional adequacy of exercise must proceed from the individual facts of each case. *Toussaint v. Yockey*, 722 F.2d at 1493. If plaintiffs were free to exercise or even walk about indoors for any significant period of time each day, outdoor exercise might not be required. *Cf. Clay v. Miller*, 626 F.2d 345, 347 (4th Cir.1980). However, plaintiffs have no such opportunity, but are confined within cells of less than 50 square feet virtually 24 hours per day. A substantial percentage are so confined for months or years. As the Ninth Circuit noted in affirming the preliminary injunction, these circumstances are similar to those present in *Spain*. *Toussaint v. Yockey*, 722 F.2d at 1493. The Court concludes that under circumstances of lockup at San Quentin and Folsom, each inmate must be provided with at least that degree of exercise required by the preliminary injunction, but that exercise may be suspended in the case of any inmate for a period not exceeding ten days for genuine reasons of discipline, inmate safety or prison security. Also, the Court concludes that decent "meaningful exercise" requires that when weather is inclement during a period of outdoor exercise, the exercising inmates be issued suitable rain gear.

Because these standards are not met, the exercise accorded plaintiffs violates the Eighth Amendment.

### P. *Visitation*

Visits, particularly contact visits, are undoubtedly important to effective penological administration. Contact visits give inmates something to look forward to, and promote and preserve social ties critical for any hope of successful reentry into

---

**43.** The "inexcusable" nature of a rat infestation in isolation cells has been recognized. *Holt v. Sarver*, 309 F.Supp. 362, 378 (E.D.Ark.1970).

For another case ordering action to control pest infestation in a prison, *see Palmigiano*, 443 F.Supp. at 987.

the free world. However, contact visits also entail serious security risks. The record amply establishes that contact visits at both San Quentin and Folsom are often used by inmates to smuggle drugs, weapons and other contraband into the institution. For precisely this reason, the Supreme Court has concluded that the denial of all contact visits to pretrial detainees held for over 30 days does not violate the due process clause of the Fourteenth Amendment. *Block v. Rutherford,* —— U.S. ——, —— – ——, 104 S.Ct. 3227, 3232–34, 82 L.Ed.2d 438 (1984). Eighth Amendment principles do not require a contrary result in this case involving convicted prisoners. *See Ramos,* 639 F.2d at 578–81; *Newman,* 559 F.2d at 291; *see also Union County Jail Inmates,* 713 F.2d at 998 (conditions permissible for pretrial detainees under due process clause *a fortiori* permissible for convicted prisoners under Eighth Amendment). The visiting restrictions applied to segregated inmates by defendants, which deprive none of all visits and accord most contact visits, are not "so totally without penological justification" that they violate the Eighth Amendment.[44] *See Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399; *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976) (plurality opinion).

### Q. *Telephone Service*

Plaintiffs cite no authority for the assertion that the complete denial to inmates of access to telephones violates contemporary standards of decency inherent in the Eighth Amendment. The Court cannot conclude that such a denial of access is indecent, or that it violates the Constitution.

### R. *Legal Research Materials*

Unlike plaintiffs' other claims, the claim respecting access to legal research materials is founded on the requirements of due process, not the Eighth Amendment. These requirements are quite specific: Prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with either access to adequate law libraries or adequate assistance from persons trained in the law. *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). *Bounds* and other cases condemn prison and jail *systems* that deny classes of inmates the required access. *E.g., id.* at 818–21, 97 S.Ct. at 1493–95; *Leeds,* 630 F.2d at 676–77; *Ruiz,* 679 F.2d at 1153–55; *Ramos,* 639 F.2d at 582–85; *Wolfish,* 573 F.2d at 133 (reversed on other grounds); *Martino,* 563 F.Supp. at 1003–04.

Due process requires, in this respect, that the libraries available to inmates be "adequate" and that regulations governing inmate use of the library permit the meaningful use of the library. *See Ramos,* 639 F.2d at 583–85; *Martino,* 563 F.Supp. at 1003. The evidence in this case is not sufficient to permit the Court to conclude that the law library at either prison is presently inadequate. However, the current system of "paging" books is constitutionally deficient. *See Martino,* 563 F.Supp. at 1003; *see also Williams v. Leeke,* 584 F.2d 1336, 1338–39 (4th Cir. 1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). Even an individual highly trained in the law would be unable to secure meaningful access to the courts through such a system. *See Ramos,* 639 F.2d at 585.

### S. *Idleness*

The wisdom of defendants' present policy of confining all inmates in their cells around the clock, with no program or organized activity of any kind to occupy their time and attention, is dubious. Such confinement likely increases overall tension and promotes the very antisocial tendencies

---

**44.** Plaintiffs ask the Court as well to order that defendants provide some of them with opportunities for family visits. Such visits are plainly not required by the Eighth Amendment. The Court commends the efforts defendants have made to provide such visits to as many inmates as possible, and further commends the recent efforts defendants have made to improve and expand visiting facilities at Folsom.

that segregation is supposed to control. Inmates without programs become ever less likely to succeed in becoming functional members of society, and ever more likely to follow a lifelong cycle of release, crime, and reimprisonment. As the Court has found, lockup confinement without program produces extreme boredom, a form of psychological pain. However, the Court's function is not to sit in judgment of the policy choices of state officials. *See Bell v. Wolfish*, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979). The Court must rather follow the recent admonition of the Ninth Circuit that programs for segregated inmates "simply are not constitutionally required." *Hoptowit*, 682 F.2d at 1258; *see also Newman*, 559 F.2d at 291.

Highly relevant to this conclusion is that in this case, the denial of programs to plaintiffs is not "totally without penological justification." At least in theory, each plaintiff has been selected for segregation on the basis of criteria indicating that he is in some way unfit or unsuited for intermingling with other inmates, whether because he has misbehaved, because he presents a threat to the safety of other inmates, or because he has requested isolation from other inmates for his own protection.[45] Thus, the Court's conclusion as to the constitutionality of confinement without programs might be different if the entire inmate population of an institution were denied any work, recreation, education, or vocational training. *Cf. Laaman*, 437 F.Supp. at 317–18; *Barnes v. Government of the Virgin Islands*, 415 F.Supp. 1218, 1226 (D.V.I.1976).

### T. *Health Care at Folsom*

■ The standard of decency governing the medical care a penal institution must provide to its inmates was defined by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits "deliberate indifference to serious

medical needs" of prisoners. *See Hoptowit*, 682 F.2d at 1253; *Ruiz*, 679 F.2d at 1149. The infirmary at Folsom and the medical services provided lockup inmates at Folsom are perhaps inadequate from a strictly medical point of view, as Dr. Jordan, the Chief Medical Officer, testified. The doctor-patient ratio is less than experts recommend; however, it is error to "constitutionalize" such standards. *Ruiz*, 679 F.2d at 1150; *see Laaman*, 437 F.Supp. at 312. The health care delivered at Folsom, while properly subject to criticism, is not as bad as that found to embody systemic "deliberate indifference" to inmate needs in other cases. *Cf. Hoptowit*, 682 F.2d at 1252 (prison lacked full-time chief medical officer, sick call was not conducted daily, and guards held discretion concerning whether inmates received treatment by physician); *Ramos*, 639 F.2d at 575–78 (less than 10 hours per week of on-site primary physician coverage, and no on-site psychiatrist or psychologist provided); *Capps v. Atiyeh*, 559 F.Supp. 894, 911 (D.Ore.1982) (record contained numerous instances of misdiagnosis or delayed diagnosis resulting in needless pain and injury); *Martino*, 563 F.Supp. at 989–91 (jail had no regular physician; all medical care supervised by nurse who attempted to diagnose inmate complaints).

The medical care provided lockup inmates at Folsom falls very near the constitutional borderline. Giving prison officials the benefit of the doubt, the Court concludes that the system of health care delivery at Folsom does not manifest "deliberate indifference to serious medical needs" of the inmates. *See Hoptowit*, 682 F.2d at 1253 (defining "deliberate indifference" in this context).

### U. *Violence*

■ Prison officials have a duty to protect inmates from constant threats of violence at the hands of other inmates and

---

**45.** Indeed, as discussed below, inasmuch as the State of California has chosen to make participation in work and other programs a factor significantly affecting the length of incarceration, the question whether these criteria are satisfied assumes constitutional due process significance.

staff. *Hoptowit,* 682 F.2d at 1250; *Ramos,* 639 F.2d at 572. This duty is violated if officials are "deliberately indifferent to the safety needs" of the inmates. *Id.* Thus, courts must enjoin aspects of jail and prison operations that unduly jeopardize inmate safety. Courts must also enjoin conditions of confinement that are directly and indisputably linked to continual fear and violence, such as the double-celling involved in this case.

 Citing *Hoptowit,* plaintiffs suggest that the Court should infer the existence of deliberate indifference to inmate safety from the extraordinarily high levels of violence in lockup units at San Quentin and Folsom. *See* 682 F.2d at 1250. To establish a constitutional violation, however, it must be shown that in the face of such levels of violence, prison officials have failed to undertake reasonable steps to protect the inmates. *See Doe v. District of Columbia,* 701 F.2d 948, 961 (D.C.Cir.1983) (concurring statement of Edwards, J.). One example of such a violation is the failure to provide adequate guards. *E.g., Hoptowit,* 682 F.2d at 1250; *Ramos,* 639 F.2d at 573; *Martino,* 563 F.Supp. at 988; *Holt,* 309 F.Supp. at 382–84. Another is the failure to make any attempt to separate hardened, violent inmates from younger, vulnerable ones. *E.g., Wright v. Rushen,* 642 F.2d at 1134 n. 3; *Martino,* 563 F.Supp. at 997. Still another is the use of physical facilities that do not enable authorities to detect or prevent violence. *E.g., Ramos,* 639 F.2d at 573; *Martino,* 563 F.Supp. at 988. Of course, guard brutality is not tolerated. *E.g., Hoptowit,* 682 F.2d at 1249–50.

 This case involves no claim that any of these violations of the duty to prevent violence have occurred. To the contrary, plaintiffs attack practices, such as the maintenance of armed guards within the lockup units and the continuous confinement of segregated inmates, that are clearly *intended* to deter and prevent violence.[46] It is possible that as various witnesses testified, many or all of the challenged practices are in the long term counterproductive. Again, however, it is not the Court's function to judge the relative wisdom of defendants' policies. Defendants' challenged practices do not manifest "indifference," nor are they so plainly misguided as to be "totally without penological justification." They are not unconstitutional.

### V. Overcrowding

 Overcrowding *per se* is not unconstitutional, although the conditions resulting from overcrowding may be. *Fischer v. Winter,* 564 F.Supp. 281, 298 (N.D.Cal. 1983). Plaintiffs ask the Court to rule that the overcrowding in the entire California prison system is unconstitutional because it is the root cause of the evils identified herein. The Court will not so rule. If all of the above-discussed conditions violating the Eighth Amendment are punctiliously remedied, and no new violations permitted to arise, then conditions will be decent and segregation at San Quentin and Folsom will no longer constitute cruel and unusual punishment as it does now. The state of affairs in the remainder of the California prison system is not before the Court.

### W. Standards Governing Placement in Segregation

If any facet of this case is more shocking than the physical conditions to which plaintiffs are subjected, it is the absolute capriciousness with which inmates are selected to suffer the grievous fate of assignment to segregation. Eight years ago, the Court entered an injunction designed to relieve the due process concerns raised by such arbitrary assignments. *Wright v. Enomoto,* 462 F.Supp. 397 (N.D.Cal.1976), *aff'd,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). This order proved insufficient to

---

**46.** To the extent that plaintiffs challenge as excessive the modes of force authorized by defendants, such as tear gas and high-powered rifles, the evidence fails to establish that the actual use of such devices exceeds constitutional limits. *See generally Spain v. Procunier,* 600 F.2d 189, 193–96 (9th Cir.1979).

end arbitrariness, partly because it did not receive full compliance. The Court therefore ordered further injunctive relief. *Toussaint v. Rushen,* 553 F.Supp. 1365, 1386–87 (N.D.Cal.1983), *aff'd in relevant part,* 722 F.2d 1490 (9th Cir.1984). While affirming this grant of further relief, entered as part of a preliminary injunction, the Ninth Circuit noted that intervening decisions call into question whether defendants' arbitrary practices violate either the cruel and unusual punishment clause of the Eighth Amendment or the due process clause of the Fourteenth Amendment. *Toussaint v. Yockey,* 722 F.2d at 1494 n. 6. While expressing no doubt as to the controlling force of *Wright v. Enomoto* as the law of the case, the footnote suggested that this Court should reconsider whether any further relief is warranted.

The Court, upon such consideration, concludes that further injunctive relief must be entered for three separate reasons.

First, relief is needed to ensure that prisoners are not deprived of a liberty interest without due process of law. The Supreme Court in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), held that although there is no federally protected liberty interest in freedom from the strictures of administrative segregation standing alone, *id.* at 869–70, such a liberty interest can arise from the mandatory language of a state statute or regulation, *id.* at 871. For purposes of this case, the relevant statutes creating a liberty interest in freedom from assignment to segregation are the California worktime laws, Cal.Penal Code §§ 2931, 2932, and 2933.[47] Set forth at length in the margin, these laws require that each California inmate "shall" be afforded an opportunity to earn a reduction in time served by participating in qualifying work, training, or educational programs, unless the inmate has committed specific misconduct amounting to at least a

---

47. Cal.Penal Code § 2931 is the basic good time credit law applicable to all prisoners whose crimes were committed prior to January 1, 1983. That section reads, in part pertinent to the issues here:

> (c) One month of [the maximum allowable] reduction [in the term of imprisonment] ... shall be based solely upon participation in work, educational, vocational, therapeutic or other prison activities. [T]hose confined for other than behavior problems *shall* be given specified activities commensurate with the custodial status.

(Emphasis added).

Cal.Penal Code § 2933 is the good time credit law applicable to all prisoners whose crimes were committed on or after January 1, 1983, and to any other prisoner who elects to be governed by its provisions pursuant to Cal.Penal Code § 2934. It states in part:

> (a) It is the intent of the Legislature that persons convicted of crime and sentenced to state prison ... serve the entire sentence imposed by the court, except for a reduction in the time served in the custody of the Department of Corrections for performance in work, training, or education programs established by the Director of Corrections ....
>
> (b) ... Except as provided in subdivision (a) of section 2932, every prisoner *shall have* a reasonable opportunity to participate in a full-time credit qualifying assignment in a manner consistent with institutional security and available resources.

(Emphasis added).

Cal.Penal Code § 2932(a) provides, in part:

> (a) For any time credit accumulated pursuant to Section 2931 or to Section 2933, not more than 180 days of credit may be denied or lost for a single act of misconduct which could be prosecuted as a felony whether or not prosecution is undertaken. Not more than 90 days of credit may be denied or lost for a single act of misconduct which could be prosecuted as a misdemeanor, whether or not prosecution is undertaken. Not more than 30 days of credit may be denied or lost for a single act of misconduct defined by regulation as a serious disciplinary offense by the Department of Corrections. Any person confined due to a change in custodial classification following the commission of a serious disciplinary infraction shall, in addition to any loss of time credits, be ineligible to receive participation or worktime credit for a period not to exceed the number of days credit which have been lost for such act of misconduct. In unusual cases, an inmate may be denied the opportunity to participate in a credit qualifying assignment for up to six months beyond the period specified in this subdivision if the Director of Corrections finds, after a hearing, that no credit qualifying program may be assigned to the inmate without creating a substantial risk of physical harm to staff or other inmates. At the end of the six-month period and of successive six-month periods, the denial of the opportunity to participate may be renewed upon a hearing and finding by the director.

"serious disciplinary infraction" or, in "unusual cases," where "the Director of Corrections finds, after a hearing, that no credit qualifying program may be assigned to the inmate without creating a substantial risk of harm to staff or other inmates."[48] Cal.Penal Code §§ 2931(c), 2933(b), 2932(a) (West's 1984 supp.).

As the Court has found, the assignment of inmates to segregation at San Quentin and Folsom, as it is presently administered, deprives them of any opportunity to participate in work, educational, or vocational programs, and thereby deprives them of the opportunity to earn full sentence credit. However, the mandatory "shall" language of section 2932(a) creates an expectation protected by the due process clause of the Fourteenth Amendment that this deprivation will not be imposed absent satisfactory proof of one of the grounds listed in that section.[49] *Cf. Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) ("a State creates a protected liberty interest by placing substantive limitations on official discretion"). In this respect, the case is similar to *Wolff v. McDonnell*, 418 U.S. 539, 555–59, 94 S.Ct. 2963, 2974–76, 41 L.Ed.2d 336 (1976), in which the Supreme Court found that Nebraska statutes and regulations created a protected liberty interest in freedom from arbitrary deprivation of good time credit. In the context of that case, the Court concluded that "[s]ince prisoners in Nebraska

can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed." *Id.* at 558, 94 S.Ct. at 2976.

This case is unlike both *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), neither of which involved any state-created expectation amounting to a liberty interest.[50] *Meachum*, 427 U.S. at 226, 96 S.Ct. at 2539; *Montanye*, 427 U.S. at 243, 96 S.Ct. at 2547. Also, unlike in *Meachum, Montanye* and *Hewitt*, assignment to programless lockup at San Quentin or Folsom increases the length of time the inmate is required to spend in custody. *Cf. Meachum*, 427 U.S. at 222, 96 S.Ct. at 2537; *Montanye*, 427 U.S. at 238, 96 S.Ct. at 2545; *Hewitt*, 103 S.Ct. at 870. While not a prerequisite to the existence of a liberty interest, *see Hewitt*, 103 S.Ct. at 870–71, this factor assumes importance here because it augments the quantum of "process" that is due. *See id.* at 872; *compare Wolff*, 418 U.S. at 564–72, 94 S.Ct. at 2978–82 (procedures required where length of time in custody is affected) with *Hewitt*, 103 S.Ct. at 872–74 (procedures required where length of time is not affected).

**48.** Inmates are also afforded extensive procedural protections in connection with resolution of the question whether these standards have been met. *See* Cal.Penal Code § 2932(a), (c).

**49.** Defendants, on motion to alter or amend the judgment, maintain that the California worktime laws do not create any protected liberty interest because Cal.Penal Code § 2933(b) states "Worktime credit is a privilege, not a right." However, the Supreme Court has "rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' of a 'privilege'." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (quoting *Graham v. Richardson*, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971)). *But see Hill v. Denton*, No. C 83–4745 WHO (N.D.Cal. filed Aug. 10, 1984) (unpublished order).

Defendants also cite *In re Cleaver*, 158 Cal. App.3d 770, 204 Cal.Rptr. 835 (1984), in support of their argument that the worktime statutes create no constitutional entitlement to participate in a program. That case, however, does not deal with the question of whether the worktime statutes give rise to any liberty interest, but merely holds that a pretrial detainee is not deprived of equal protection of the law or the due process right to a jury trial because he is excluded from the benefits of the worktime statute. *Id.* 204 Cal.Rptr. 835 at 837–38.

**50.** For the same reason, this case is unlike *Gibson v. Lynch*, 652 F.2d 348 (3d Cir.1981), *cert. denied, Stanley v. Zimmerman*, —— U.S. ——, 103 S.Ct. 3123, 77 L.Ed.2d 1375 (1983).

██ The second basis for entering further injunctive relief concerning placement of plaintiffs in segregation is that the conditions of such segregation, as the Court concludes above, violate the Eighth Amendment. As a general rule, even an indeterminate assignment to punitive isolation does not constitute cruel and unusual punishment, and a court is not warranted in imposing limits on such assignments. *Toussaint v. Yockey,* 722 F.2d at 1494 n. 6; *see Gibson v. Lynch,* 652 F.2d 348, 352–53 (3d Cir.1981). When the conditions of confinement in segregation violate the Eighth Amendment, however, assignment to segregation subjects an inmate to a form of cruel and unusual punishment. The Supreme Court has specifically held that a court may regulate the length of time an inmate can be required to spend confined in segregation in the midst of indecent, unconstitutional conditions. *Hutto v. Finney,* 437 U.S. 678, 685–87, 98 S.Ct. 2565, 2570–72, 57 L.Ed.2d 522 (1978). Logically, the same considerations permit a court to regulate initial placement in segregation amidst such conditions as well. *See Hewitt,* 103 S.Ct. at 876 n. 4 (opinion of Stevens, J.).

In this case, the basic reason why the Court will allow defendants to continue operating the existing segregation units, rather than ordering transfer of all inmates out of those units until all constitutional violations are remedied, is that prison security would be unduly jeopardized by the latter remedy. *See* Part IV, *infra.* For so long as lockup conditions continue to violate the Eighth Amendment, the Court must scrutinize the reasons assertedly justifying placement and retention of each inmate in segregation to ensure that they correspond to legitimate security considerations.

The third and final ground for entry of further relief concerning standards governing assignment to segregation is that the Court's prior order in *Wright v. Enomoto* has been consistently overlooked or disobeyed. The Court's power to grant further relief to effectuate the prior order is well established. *Toussaint v. Yockey,* 722 F.2d at 1494 (upholding this Court's order

requiring periodic review of reasons for retention in segregation); *see Hoptowit,* 682 F.2d at 1247; *Ruiz,* 679 F.2d at 1155; *see also Hutto,* 437 U.S. at 687, 98 S.Ct. at 2571.

### X. *Compliance with Court Orders*

██ Evidence at trial established that numerous provisions of the preliminary injunction and other orders entered by the Court in this case have been disregarded by defendants and their employees. The record of compliance is spotty at best. Still more disturbing, the evidence revealed that cruel and unusual punishments such as the use of "quiet cells" are sometimes inflicted without defendants' knowledge or permission. The Court expects that each and every provision of the permanent injunction to be entered will be scrupulously observed. However, the history of noncompliance compiled by defendants over the ten-year course of this litigation must guide the Court in shaping a remedial decree.

The record of noncompliance constitutes an "exceptional condition" requiring the appointment of a Special Master pursuant to Fed.R.Civ.P. 53(a) to monitor compliance with the permanent injunction. *See Ruiz,* 679 F.2d at 1160–61; *Gary W. v. State of Louisiana,* 601 F.2d 240, 245 (5th Cir.1979); *Newman,* 559 F.2d at 290; *Gautreaux v. Chicago Housing Authority,* 384 F.Supp. 37 (N.D.Ill.1974). The appointment of a monitor is also required by the complex nature of the litigation and of the measures defendants must undertake to effect prompt compliance with constitutional standards required by the injunction today ordered. *See Hoptowit,* 682 F.2d at 1263; *Ruiz,* 679 F.2d at 1160 & n. 238. Courts have not hesitated to appoint a monitor or other similar officer when required to secure effective relief for unconstitutional jail or prison conditions. *E.g., McMurry v. Phelps,* 533 F.Supp. 742, 774 (W.D.La. 1982); *Powell v. Ward,* 487 F.Supp. 917, 935 (S.D.N.Y.1980) (special master appointed to oversee and report on compliance with order governing placement in segrega-

tion where defendants exhibited lack of concern for state of compliance with prior order), *modified in part on other grounds,* 643 .F.2d 924 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981); *Jones v. Wittenberg,* 73 F.R.D. 82, 85 (N.D.Ohio 1976); *Pugh v. Locke,* 406 F.Supp. 318, 331–32 (M.D.Ala. 1976), *modified sub nom. Newman v. State of Alabama,* 559 F.2d 283 (5th Cir. 1977); *Miller v. Carson,* 401 F.Supp. 835, 841 (M.D.Fla.1975), *modified,* 563 F.2d 741 (5th Cir.1977).

Accordingly, the Court will appoint a monitor as Special Master to report to the Court from time to time concerning the state of compliance with the permanent injunction. The monitor shall serve only until such time as it is clear that defendants have put an end to the violations of constitutional rights prohibited by the injunction. Compensation of the Master will be fixed by the Court and paid by defendants as a part of the costs of this litigation. Fed.R.Civ.P. 53(a); *See Newman,* 559 F.2d at 290; *Valentine v. Englehardt,* 474 F.Supp. 294, 304 (D.N.J.1979).

### IV. RELIEF

■■■■ The proper remedy for conditions of confinement violating the Eighth Amendment is an order enjoining further confinement under such conditions. *See, e.g., Hutto v. Finney,* 437 U.S. 678, 685–88, 98 S.Ct. 2565, 2570–72, 57 L.Ed.2d 522 (1978); *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir.1982); *Ruiz v. Estelle,* 679 F.2d 1115, 1144–45 (5th Cir.1982); *Ramos v. Lamm,* 639 F.2d 559, 586 (10th Cir.1980). In framing its order, the Court must consider the cost of compliance and the effects of the relief upon prison security. *Hoptowit,* 682 F.2d at 1247; *Wright v. Rushen,* 642 F.2d at 1134. Generally speaking, these considerations preclude a court from

ordering immediate closure of a facility violating Eighth Amendment standards, which would certainly be the fastest and most effective means of eradicating the constitutional violation itself. *See, e.g., Ramos,* 639 F.2d at 585–86. Instead, the remedial order must address only the specific conditions that violate the Constitution, and only to the extent required to correct the specific violations.[51] *Hoptowit,* 682 F.2d at 1247; *see Wright v. Rushen,* 642 F.2d at 1133–34. If the state has undertaken *bona fide* steps to alleviate poor prison conditions, courts should defer to the policy choices the state has made when shaping its remedy.[52] *Hoptowit,* 682 F.2d at 1247.

In formulating a permanent injunction to enter in this case, the Court has considered all of these admonitions.

■■■■ The permanent injunction to be entered will require substantial and immediate expenditures by defendants. However, cost cannot stand in the way of eliminating conditions that violate the Eighth Amendment. *Wright v. Rushen,* 642 F.2d at 1134; *Spain v. Procunier,* 600 F.2d 189, 200 (9th Cir.1979); *Ahrens v. Thomas,* 434 F.Supp. 873, 898 (W.D.Mo.1977), *modified,* 570 F.2d 286 (8th Cir.1978). Rather, cost considerations govern only the selection among alternative remedial options. *See Wright v. Rushen,* 642 F.2d at 1134. The Court has deferred to such concerns by requiring in the preliminary injunction only, in most instances, that conditions be brought within constitutional requirements. Where specific remedial actions are ordered, it is because the evidence sufficiently establishes such actions to be the only feasible and satisfactory means of curing the deficiencies in question.

The Court has framed the permanent injunction with full awareness that many of the inmates affected are among the most dangerous, violent men in the State of

---

**51.** A remedy may go beyond this, however, when there is a record of past constitutional violations and violations of past court orders. *Hoptowit,* 682 F.2d at 1247.

**52.** This admonition has little application here. The record is devoid of evidence indicating that

defendants have formulated and implemented plans for improving lockup conditions at San Quentin and Folsom absent prodding from the Court, despite the many recommendations from numerous sources that such conditions be alleviated.

California. Plainly, defendants are reasonable in maintaining that there is a need to keep some of these prisoners from mingling with the general prison population. Consequently, upon a showing that one of several criteria relating to concerns of inmate safety or prison security is met, the injunction will permit the segregated housing of an inmate during the interim period in which unconstitutional conditions of confinement have not yet been completely eliminated. The injunction will also allow the assignment, during the interim period, of an inmate to a reasonable term of segregation for punitive reasons, if defendants satisfactorily show that the inmate has been guilty of serious misbehavior.

The Court is satisfied that no relief provided in the permanent injunction is incompatible with legitimate security concerns. As an added safeguard, however, the injunction permits the Director of the California Department of Corrections, or the Warden of either prison, temporarily to suspend compliance during a state of genuine emergency. *See Hoptowit*, 682 F.2d at 1259; *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir.1980).

The foregoing constitute the Findings of Fact and Conclusions of Law upon which the Judgment of Permanent Injunction has this day been rendered.

### ORDER OF REFERENCE

For reasons set forth in the Findings of Fact and Conclusions of Law entered this day, the Court has determined that this is a proper case for reference to a Special Master pursuant to Federal Rule of Civil Procedure 53. In this order, the Special Master to be appointed will be referred to as "Monitor." *See* Fed.R.Civ.P. 53(a).

IT IS HEREBY ORDERED that the duties of the Monitor are and shall be the following:

1. To inspect from time to time each facility affected by the Court's Permanent Injunction entered this day governing the California State Prison at San Quentin ("San Quentin") and the California State Prison at Folsom ("Folsom").

2. To report to the Court from time to time concerning the state of compliance with the Permanent Injunction and the state of conditions of confinement in segregation at San Quentin and Folsom.

3. To advise the Court concerning any modification or modifications to the Permanent Injunction that may appear necessary or that may be requested by a party.

4. To review the placement and retention of prisoners in segregation, as provided in Part IV(D) of the Permanent Injunction.

5. To perform such other duties as the Court may assign.

The Monitor shall continue to perform these duties until such time as he may be relieved by the Court or until the Court may adopt the Monitor's written report that defendants are in full compliance with the Permanent Injunction and that conditions of confinement in segregation units at San Quentin and Folsom do not violate the Constitution. Should the Court relieve the Monitor of his duties, the Court shall have power to appoint a successor.

IT IS FURTHER HEREBY ORDERED that the powers of the Monitor are and shall be the following:

1. To enter, at any reasonable time, with or without advance notice, any part of any facility affected by the Permanent Injunction.

2. To interview, on a confidential basis or otherwise, any person, including any correctional staff member or inmate, affected by the Permanent Injunction. Defendants shall provide suitable facilities and arrangements for the conduct of such interviews under conditions satisfactory to the Monitor.

3. To attend institutional meetings and proceedings required by the Permanent Injunction.

4. To obtain any document in the possession of any party relevant to the state of compliance with the Permanent Injunction or the state of conditions of confinement at San Quentin and Folsom.

5. To require the posting of notices in any part of any facility affected by the Permanent Injunction, in such number and form as the Monitor may direct.

6. To convene hearings concerning any matter relating to the state of compliance with the Permanent Injunction, the state of conditions of confinement in segregation at San Quentin or Folsom, or the placement or retention of any prisoner in segregation. To this end, the Monitor is empowered to require the attendance of witnesses, including both prisoners and employees of the California Department of Corrections, to make a record of the proceedings, and to exercise all other powers described in Federal Rule of Civil Procedure 53(c).

7. To retain from time to time experts, specialists, or other persons whose advice or testimony the Monitor deems necessary or desirable for the purpose of making findings concerning the conditions of confinement in segregation at San Quentin or Folsom.

8. To review the placement and retention of prisoners in segregation, and to require the release of prisoners assigned to segregation without sufficient basis, in accordance with the provisions of Part IV(D) of the Permanent Injunction.

IT IS FURTHER HEREBY ORDERED that prior to filing any of his reports with the Court, the Monitor shall serve copies of the proposed report upon one designated representative of counsel for plaintiffs and one designated representative of counsel for defendants (hereafter referred to as the two "sides"). The Monitor shall afford a reasonable time within which specific written objections to the proposed report or any part thereof may be submitted by either side. Upon the request of either side, submitted in conjunction with specific written objections, the Monitor shall convene a hearing prior to filing the report with the Court. All reports of the Monitor shall be filed in accordance with Federal Rule of Civil Procedure 53(e)(1).

IT IS FURTHER HEREBY ORDERED that any report of the Monitor shall be adopted as the findings of fact and conclu-

sions of law of the Court unless, within ten days after being served with notice of the filing of the report, either side moves to reject or modify the report. The Court will entertain no objection to any report unless it is shown as a preliminary matter that an identical objection was submitted to the Monitor in the form of a specific written objection in accordance with the preceding paragraph of this Order. In accordance with Federal Rule of Civil Procedure 53(e)(2), the Court shall accept the Monitor's findings of fact unless clearly erroneous.

IT IS FURTHER HEREBY ORDERED that the Monitor shall be compensated at the rate of Seventy-Five Dollars ($75.00) per hour for services performed in accordance with this Order. This rate has been determined by the Court by reference to the rate the Monitor named herein would reasonably charge for comparable services performed for private clients, and is subject to change by further order of the Court. All reasonable expenses incurred by the Monitor in carrying out his duties under this Order shall be reimbursed as costs of the mastership.

IT IS FURTHER HEREBY ORDERED that costs of the mastership, including the Monitor's fees and expenses, shall be borne by defendants as part of the costs of this action. The Monitor shall submit to defendants or their designated representative periodic itemized statements of fees and expenses. All fees and expenses to requested shall be paid by defendants within fourteen (14) days of the receipt of each statement.

IT IS FURTHER HEREBY ORDERED that unless inconsistent with the express provisions of this Order of Reference, Federal Rule of Civil Procedure 53 shall govern all questions relating to the scope of this reference and the Monitor's duties and powers hereunder.

IT IS FURTHER HEREBY ORDERED that Robert R. Riggs is appointed to serve as Monitor for the Court in this action. Mr. Riggs is a member of the State Bar of

California and the bar of this Court. He received the degree of Juris Doctor from Stanford Law School in 1982, where he graduated with an outstanding record. He has since served as a law clerk for a judge of the United States Court of Appeals for the Ninth Circuit. He has also served for more than a year as a law clerk for the judge presiding in this action. In that capacity, he has ably assisted the Court in connection with all aspects of the case. Acting as law clerk-crier, Mr. Riggs was present in the courtroom nearly every day of trial. He is thoroughly familiar with the entire record in this action and with the law applicable to the issues presented. He is also thoroughly familiar with the Findings of Fact, Conclusions of Law, and Permanent Injunction entered by the Court herein. The Court reposes special confidence in him and his capacity to serve reliably and effectively as Monitor.

## JUDGMENT OF PERMANENT INJUNCTION

Based upon the Findings of Fact and Conclusions of Law this day filed:

IT IS HEREBY ORDERED, ADJUDGED, and DECREED as follows:

Defendants, the Director of the California Department of Corrections, the Wardens of the California State Prison at San Quentin and the California State Prison at Folsom, their agents, servants, employees, successors in office and all persons acting in their aid or in participation with them, are advised, enjoined and ordered as follows:

### I

It is not the intent of this Permanent Injunction to prohibit nor does it prohibit the Director or any Warden from temporarily suspending compliance with all or any part of this Injunction during a state of riot or turmoil or other genuine emergency. The determination by the Director or Warden that a state of genuine emergency exists shall be set forth in writing as soon as reasonably possible, shall detail briefly with reasonable specificity the reasons for the determination, and shall be reviewable by the Court at the request of either party. The Court may permit any party to submit affidavits and documentary evidence relevant to the correctness of the determination, and may also, in its discretion, provide for the taking of discovery or oral testimony. The determination of the Director or Warden, if supported by substantial evidence, shall be conclusive. The Monitor hereinafter provided for may receive such affidavits and documentary evidence, provide for such discovery and oral testimony and, on the basis thereof, make recommendations to the Court as to what action, if any, it should take in review.

### II

Defendants, by immediate and continuous efforts, shall provide as follows with respect to all present and future members of the plaintiff class:

1. Each prisoner, upon initial assignment to segregation and upon each cell transfer while remaining in segregation, shall be provided with a clean cell, furnished with at least a bed, cot or bunk and a clean, untorn mattress, a clean, untorn blanket, a clean, untorn pillow, a properly functioning toilet and a properly functioning sink.

2. No prisoner assigned to segregation shall be involuntarily double-celled with another prisoner in any cell smaller than seventy (70) square feet.

3. All cells in which prisoners assigned to segregation are housed shall be provided with adequate heat and adequate ventilation. Defective or clearly inadequate heating and ventilating equipment and broken windows shall be repaired or replaced promptly.

4. Each facility used to house prisoners assigned to segregation shall be equipped with adequate plumbing and sewage disposal systems. Leaking pipes and fixtures, clogged or defective drains, and clogged or defective sewer lines shall be repaired or replaced promptly.

5. Any prisoner assigned to a cell in which there is no significant source of natural light, or from which all significant natural light can be excluded without the control of the prisoner, shall have under his control at all times a source of artificial light adequate to illuminate the cell. All cells used to house prisoners assigned to segregation shall be equipped with a source of artificial illumination sufficient to permit the occupant to read comfortably while seated or lying on his bunk or bed. All electric lights inside cells shall be connected to a functioning on-off switch that is under the control of the occupant during hours when the use of such lights is permitted.

6. Defendants shall undertake immediate steps to abate the levels of noise prevailing in five-tier cell blocks used to house segregated inmates. The following specific measures shall be undertaken unless and until defendants reduce the noise to acceptable levels by alternate means: (1) Inmates shall not be permitted to employ any loud-speaking device, including, for example, those devices included in televisions, radios, and stereophonic equipment, unless the device is incapable of producing sound noticeably audible to any person outside the cell of the inmate using the device. (2) Defendants shall install sound-absorbing wall coverings in all five-tier units. (3) Defendants shall provide each inmate assigned to segregation and housed in a five-tier cell block with a set of medically approved sound exclusion devices such as, for example, earplugs. If earplugs are used, they shall be issued monthly.

7. Each facility used to house prisoners in segregation shall be equipped with electrical wiring reasonably safe from danger of fire or electrocution.

8. Each facility used to house prisoners in segregation shall be reasonably safe from danger of death or serious injury caused by fire. Defendants shall develop and rehearse plans for the speedy egress of all segregated inmates in the event of serious fire.

9. Each prisoner assigned to segregation shall be provided with clean, untorn clothing reasonably appropriate in size. Such clothing shall be laundered on a regular, not less than bi-weekly, basis. Blankets shall be laundered not less than once every six months. Towels and sheets shall be laundered not less than once every two weeks. This provision does not require defendants to relieve any prisoner of the consequences to that prisoner of damage done deliberately by the prisoner to clothes, blankets, towels or sheets.

10. Each prisoner assigned to segregation and housed in a cell without hot running water shall be permitted no less than three (3) showers each week. All shower facilities used by prisoners assigned to segregation shall be maintained in reasonably sanitary condition with adjustable hot and cold running water. Defendants shall ensure that each prisoner assigned to segregation is supplied with adequate quantities of materials necessary to sound personal hygiene.

11. Each facility used to house segregated inmates shall be maintained in sanitary condition. Defendants shall undertake the following specific measures to ensure adequate sanitation: (1) Each prisoner shall be required to maintain his cell in reasonably sanitary condition. (2) Each prisoner shall be provided with a container in which to store garbage. Garbage shall be collected from each cell on a regular basis not less than once every day. (3) Tiers and floors shall be maintained in a reasonably clean and sanitary condition. (4) "Pipe chases" or service areas shall be maintained in reasonably clean and sanitary condition, free of sewage, refuse, standing or leaking water, or any other noxious substance (including gases). (5) Standing water shall be promptly removed from any portion of any unit in which it may accumulate. If necessary, drains shall be installed to carry out this provision.

This provision does not require defendants to relieve any prisoner of the consequences to that prisoner of any damage, misbehavior, or failure to perform required

cleaning tasks done or omitted deliberately by that prisoner.

12. Each unit used to house prisoners in segregation shall be maintained reasonably free of rodents, birds, insects and other vermin. Unless and until the intendment of this provision is accomplished by alternate means, defendants shall employ on a full-time basis at each prison at least one person whose exclusive duty is to manage the task of eradicating vermin.

13. All food shall be stored, prepared and served under healthful, sanitary conditions, free of spoilage or vermin infestation.

14. Each prisoner assigned to segregation shall be provided with an opportunity for outdoor exercise at least:

(a) one (1) hour every day, for a minimum total of eight (8) hours per week; or

(b) two (2) hours every other day, for a minimum total of eight (8) hours per week; or

(c) three times per week, for a minimum of one (1) hour each time, for a minimum total of ten (10) hours per week.

The provision of exercise may be suspended for a period not to exceed ten days as to any prisoner if the suspension is based upon genuine reasons of discipline, inmate safety or prison security. When weather is inclement during a period of outdoor exercise, exercising inmates shall be issued suitable rain gear.

15. In the absence of specific and compelling security reasons, documented in writing, all prisoners assigned to segregation shall be permitted to visit and use an adequate prison law library as reasonably necessary. Any prisoner denied direct access to the law library for documented reasons of security shall be permitted to order at least five books per week from that library. Books so ordered shall be delivered promptly and without fail. Each prisoner assigned to segregation shall be provided upon request with a complete listing of all books available in the prison law library and all books, if any, available to prisoners from other sources.

## III

### A.

The requirements of the order entered by the Court in *Wright v. Enomoto*, 462 F.Supp. 397, 404–05 (N.D.Cal.1976), *aff'd*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), remain in full force and effect. All of those requirements are hereby incorporated in this Permanent Injunction as if set forth in full herein.

### B.

For the reasons detailed in the Findings of Fact and Conclusions of Law, the relief granted in *Wright v. Enomoto* failed to correct defendants' arbitrary practices in imposing segregation for "administrative" reasons, and in retaining prisoners in segregation for such reasons. Defendants shall provide the following additional procedural safeguards to all present and future members of the plaintiff class housed at San Quentin and Folsom:

1. A prisoner shall be released from segregation upon his Minimum Eligible Release Date (MERD), if any, or at the expiration of twelve (12) months of consecutive confinement in segregation, whichever is shorter, unless before said MERD or before said period expires, he is afforded all the hearing rights that attend initial placement in segregation. To retain the prisoner in segregation, it must be found after a fair hearing that

(a) The prisoner has committed a disciplinary offense for which a MERD has been assigned, and the MERD has not yet been reached; or

(b) Release of the prisoner would severely endanger the lives of inmates or staff, the security of the institution, or the integrity of an investigation into suspected criminal activity or serious misconduct; or

(c) The prisoner has requested voluntarily continued retention in segregation.

2. The identity of any person providing information cited in support of placement

or retention of a prisoner in segregation may be withheld at the hearing only if disclosure would endanger the safety of the source or institutional security. In any instance where the identity of the source is withheld, the prisoner shall not be placed or retained in segregation in the absence of a written statement, available to the prisoner, setting forth an evaluation of the reliability of the source and a statement of the reasons why the identity of the source is not disclosed.

3. A prisoner shall not be placed or retained in segregation on the basis of undisclosed information.

### C.

No prisoner assigned to segregation shall be denied the opportunity to participate in a work, educational, or vocational training assignment for which sentence credit may be earned in accordance with California law unless it is first determined, in accordance with such law, that the prisoner has committed an act of misconduct which could be prosecuted as a felony or misdemeanor or which is defined by regulations of the California Director of Corrections as a serious disciplinary offense. Upon such a determination, the prisoner may be denied the opportunity to participate only for the term fixed by California law. *See* Cal.Penal Code § 2932(a). In unusual cases, the prisoner may be denied the opportunity to participate for additional six (6) month periods upon the determination of the Director of Corrections, reached in accordance with California law, that no credit qualifying assignment may be provided to the prisoner without creating a substantial risk of physical harm to staff or other inmates.

Prisoners assigned to segregation solely at their own request shall be permitted the opportunity to participate in credit qualifying assignments.

### IV

### A.

Pursuant to Fed.R.Civ.P. 53, the Court will appoint a Special Master (referred to herein as "Monitor") to monitor the progress of defendants in carrying out the provisions of this Permanent Injunction. Among the duties of the Monitor shall be to inspect each facility affected by this Injunction, to report to the Court from time to time concerning the state of compliance with this Permanent Injunction and the state of conditions of confinement in segregation at San Quentin and Folsom, and to advise the Court concerning any modifications to this Permanent Injunction that may appear necessary or that may be requested by a party. Defendants shall honor all requests by the Monitor for admission into any part of any facility affected by this Permanent Injunction. Defendants shall likewise honor all requests by the Monitor for the production of documents relevant to the state of compliance with this Injunction or the state of conditions of confinement in segregation. The duties of the Monitor shall continue until such time as he may be relieved by the Court or until the Court may adopt the Monitor's written report that defendants are in full compliance with the Permanent Injunction and that conditions of confinement in segregation units at San Quentin and Folsom do not violate the Constitution. Should the Court relieve the Monitor of his duties, the Court shall have power to appoint a successor Monitor. The period of time from the date of this Permanent Injunction to the date of the Monitor's certification shall be known as the "Interim Period."

### B.

For the duration of the Interim Period, the following additional procedures set forth in this Part IV shall be followed in connection with the placement and retention of prisoners in segregation:

1. A prisoner may be placed in segregation only as follows:

(a) The prisoner has committed a disciplinary offense sufficiently serious to warrant punishment by confinement for a fixed term in segregation, and the term fixed is reasonable; or

(b) Continued presence of the prisoner in the general population would severely endanger the lives of inmates or staff, the security of the institution, or the integrity of an investigation into suspected criminal activity or serious misconduct; or

(c) The prisoner has requested segregation for his own protection; or

(d) The prisoner is newly arrived at the prison and more information is needed to determine whether the prisoner may be incompatible with any element of the general prison population. No prisoner shall be involuntarily segregated for this reason for more than ten (10) days.

### C.

A prisoner may be retained in segregation only for a reason listed in Part III(B)(1) of this Permanent Injunction.

### D.

Any prisoner assigned to segregation as of the date of this Permanent Injunction shall be entitled to request release from segregation on the ground that there is no sufficient basis for retaining him in segregation in accordance with Part IV(C). A prisoner may submit a written statement of reasons in support of such a request. Such requests shall be considered initially by defendants or their designate, who shall determine whether to release the prisoner from segregation. If the prisoner is not released from segregation, within 21 days after the date of the request, he shall be entitled to request review by the Monitor of the decision to retain him in segregation.

Any prisoner placed in segregation during the Interim Period shall be entitled to request review by the Monitor of the decision to place him in segregation. The scope of such review shall include, but is not limited to, the adequacy of compliance with Part III(A) of this Injunction.

Any prisoner retained in segregation on the basis of the finding described in Part III(B)(1) of this Injunction shall be entitled to request review by the Monitor of the decision to retain him in segregation. The scope of such review shall include, but is not limited to, the adequacy of compliance with Part III(B) of this Injunction.

Upon a proper request for review by the Monitor pursuant to this Part of the Injunction, defendants shall immediately forward to the Monitor (1) the prisoner's request for review; (2) any written statement by the prisoner in support of his request; (3) any statement by the defendants or their designate of reasons in support of the decision to place or retain the prisoner in segregation; (4) copies of all documents and all testimony, if transcribed, relied upon by defendants in support of the decision to place or retain the prisoner in segregation; and (5) a summary of the proceedings, if any, conducted by defendants in connection with the decision to place or retain the inmate in segregation.

Following review of the materials forwarded, the Monitor may in his discretion convene a hearing or order such further proceedings as he may deem appropriate. Defendants shall provide suitable facilities for the conduct of any hearing ordered, and shall produce such witnesses and/or evidence at such time and place as the Monitor may direct. If the Monitor concludes, on the basis of all evidence submitted, that the prisoner was placed or retained in segregation in violation of any provision of this Permanent Injunction, he may order the prisoner released from segregation, or he may order defendants to conduct further proceedings if required by this Injunction.

Any decision of the Monitor upholding placement or retention of a prisoner in segregation shall be conclusive and subject to no further review.

Any final decision of the Monitor requiring release of a prisoner from segregation shall be set forth in writing and shall be subject to review by the Court upon motion of defendants. Defendants may file with the Court a memorandum in support of their request. Unless the Court vacates the decision of the Monitor within thirty (30) days following the filing of defendants'

motion, the decision of the Monitor shall be final.

Defendants shall provide to each plaintiff a notice, in a form approved by the Monitor, of the rights of plaintiffs under this Part of the Permanent Injunction.

## V

Defendants shall provide a copy of this Permanent Injunction to each member of the plaintiff class at San Quentin and Folsom within ten days of the date of this Injunction, and shall post a copy in each segregation unit where it may readily be seen by class members. Defendants shall also provide a copy of this Permanent Injunction to every employee of the California Department of Corrections at San Quentin and/or Folsom.

No person who has notice of this Permanent Injunction shall fail to comply with the letter and spirit hereof nor shall any person subvert the letter or spirit hereof by any sham, indirection, or other artifice.

## VII

The Court retains jurisdiction to modify this Injunction at any time and from time to time on its own motion or upon the motion of any party in the interest of effectuating its intendments or in the interest of furthering the ends of justice under all applicable law.